547 So.2d 42 (1989)
Melvin L. DUNN
v.
STATE of Mississippi.
No. 58526.
Supreme Court of Mississippi.
June 28, 1989.
Trent L. Howell, Water Valley, for appellant.
Mike Moore, Atty. Gen. by Deirdre D. McCrory, Sp. Asst. Atty. Gen., Jackson, for appellee.
EN BANC.
HAWKINS, Presiding Justice, for the Court:
Melvin L. Dunn appeals from his Union County circuit court conviction of arson of a dwelling. Because of the erroneous admission into evidence of his confession, given after promises and intimations of help from a law enforcement officer, we reverse and remand.

FACTS
Dunn was employed as an emergency room technician at the Union County Hospital on February 3, 1986. He and his wife Molly were separated. The two owned a residence on 514 Madison Street in New Albany. Shortly before midnight that night their house was discovered afire. No one was at home at the time. Dunn was located at his parents' home in Yalobusha County and informed of the fire. He and his parents returned to New Albany. They went to the police station, and thence to the fire station and talked with fire chief Bill McGill, who detected the smell of gasoline on Dunn's shoes. While Dunn was at the fire station a second call came in that the house was again on fire.
Dunn returned with his parents to Yalobusha County. McGill was suspicious of the fire being of incendiary origin, and notified Mike Ivy, a state fire marshal.
Dunn and David Grisham, the chief of police of New Albany, were personally acquainted, having known one another for approximately five or six years. Mrs. Grisham also worked at the emergency "department," according to Dunn.
On February 5, around noon, Grisham called Dunn (who had returned to work) to come to the New Albany police station for questioning. There he was given a form Miranda warning at 12:45 p.m., and questioned about the fire. He denied having set the fire.
Dunn was then taken to Tupelo where he was given a polygraph examination at the Tupelo City Hall by Jerry Crocker, detective with the Tupelo police department. The test indicated Dunn was lying. He was informed that the test showed he was *43 not telling the truth. Dunn admitted orally setting the house on fire, and was then taken to the Tupelo police department where he was again given the Miranda warning, and again gave a statement, reduced to writing, in which he admitted setting the house on fire. Ivy typed the written confession.
Dunn was indicted by the Union County grand jury on February 20, 1986, for feloniously and maliciously setting fire to the house belonging to him and his wife, a crime under Miss. Code Ann. § 97-17-1 (1972).
At a hearing on the motion to suppress both the oral and written confession, it developed that Grisham had taken Dunn aside before they went to Tupelo and after he had taken the polygraph, and attempted to persuade him to tell the truth about the fire. Grisham testified as follows:
Q. Now, Chief Grisham, just before you all left to go to Tupelo, you had an opportunity to speak to Melvin a few moments outside of the Deputy Fire Marshal's presence, did you not?
A. That's correct.
Q. And at that time, I believe you indicated that it would be to his best interest to tell him if he knew anything about the fire.
A. That's correct.
Q. And I believe you said that you would help him any way you could if he would tell all he knew about the fire.
A. I told him he would be better off to tell the truth about the fire.
* * * * * *
Q. Did he fail the lie detector?
A. I was informed by Mr. Crocker that he failed the lie detector test.
Q. All right, sir, and you told Melvin Dunn, one of you, I believe it was you, you told Melvin Dunn that he failed the lie detector tests; that it showed he did know something about the origin of the fire he was not telling and that, again, that it would be in his best interest if he would give a statement concerning exactly what happened concerning the fire.
A. He was advised by me that he had failed the lie detector test. I informed Mr. Dunn that if he was lying about the situation that he was not telling the truth, and it would be better off if he would tell us the truth about what happened in regard to the fire. There was no promises made of anything to be done for Mr. Dunn if he would tell about the fire, only the pure fact if he would tell the truth he would be better off. I told Mr. Dunn I didn't think he could live with hisself [sic] if he didn't tell us the truth about the fire.
Q. And you also indicated you would do all you could to help him if he would make a statement, did you not?
A. I told him I would do what ever was legal within my realms to help. [Emphasis added]
Q. All right, sir, and you have known Mr. Dunn for a long time, and he has known you for a long time, hasn't he?
A. I have known him ever since he's been here, how many years.
Q. I believe Mrs. Grisham, your wife, worked at the same place he does.
A. That's correct.
Q. And she comes in contact with him. You are aware of this.
A. Yes, sir, every day he is working.
Q. And because of your position as Chief of Police and because of his position as EMT at the hospital, I suppose you all's paths cross, and you have occasion to work together.
A. Quite often.
Q. So, he had every reason in the world to trust you, did he not?
A. I don't think he has any reason not to.
Dunn testified as follows:
A... . So, Mike Ivy said he had to make a telephone call, then. So, me and David went out into the parking lot, and while we was standing out *44 there, David told me it looked like somebody had poured something in my house and set it on fire in the kitchen, and then again upstairs, and he said I was their prime suspect, and said I needed to go ahead and tell them what I knew about the fire. And of course, I told him I didn't know anything about the fire. He said, well, I can understand you may be depressed and all because you are getting a separation from your wife, and then I was in financial difficulty. Of course, I don't know where he got all that information, but anyway, he said it would just be better if I went ahead and told him what I knew about the fire. I told him all I knew about the fire was what David had told me; that it had started in the kitchen, and then later, it started again upstairs, and he asked me again if I wouldn't go ahead and make a statement because he said it would be better off on me, and he would help me any way he could, and I could go on back to work and wouldn't have to go to Tupelo or anything like that. At that time, Mike came out. So, David said he had to do something here in the city. So, me and Mike Ivy, at that time, got in his car and went to Tupelo.
* * * * * *
Q. Did they tell you what they were talking about when they said it would be a lot better on you?
A. Well, David said that, you know, it would be just a lot easier on me and a lot quicker, and we would get it all over with a lot faster if I would just go ahead and give him a statement; said he would help me all he could; said I could go ahead and come on back to work, and you know, he would just call me the next day and let me know how everything was progressing, you know. It would pretty well be a quiet thing, and we would just get on through with it, and that it wouldn't be a whole lot to it, what I acquired from the way he was talking. [Emphasis added]
* * * * * *
Q. Now, by way of summary, what was the reason that you gave any statement to the police officers that day?
A. Well, they kept badgering me wanting a statement of some kind, so I finally decided I would go ahead and tell them my version of what happened so they would get off my back, and I could go on back to work.
* * * * * *
Q. At any time, did David Grisham or Mike Ivy or the polygraph examiner or Benny Kirk or anyone else threaten you to make you make a statement in any way?
A. They just kept telling me it would be to my best interest, and it would get over a lot quicker if I would give a statement.
Q. The essence of what they said is that it would be in your best interest to tell the truth. That's really what they were saying, wasn't it?
A. That wasn't what they said.
Q. What did they say?
A. Said it would be to the best of my interest to go ahead and give them a statement or confess that I done it, set the fire.
Q. You certainly wouldn't confess to something you didn't do, would you?
A. No. That's why I give them a statement.
Dunn was tried on September 4-5, 1986, following which the jury returned a verdict of guilty, and he was sentenced to three years, with three years supervised probation.

LAW
Dunn raises several assignments of error, none of which we find persuasive except his claim that his confession should have been excluded.
Long before Miranda warnings were mandated by the U.S. Supreme Court, it *45 was well settled in Mississippi jurisprudence that a confession given after promises of leniency was incompetent as evidence.
In Mitchell v. State, 24 So. 312 ((Miss. 1898), we held that a confession given by a defendant was not voluntarily made subsequent to his being told by the sheriff that it would be "best for him to tell all about it."
In Johnson v. State, 89 Miss. 773, 776, 52 So. 606 (1907), a private citizen told the defendant he would intercede with the trial judge to keep him from being hanged, and "also had told appellant that it would be better for him to confess, as it would go lighter with him if he told the truth." Upon appeal, we held the confessions "clearly inadmissible, under the doctrine as settled in this state."
In Mathews v. State, 102 Miss. 549, 59 So. 842 (1912), a black defendant fourteen years of age accused of stealing an item of jewelry had been told by the town marshal that it would be better for him to get the pin, if he would tell the truth, "it would be all right," and "I don't want to put you in any trouble." We held the confessions subsequently made were not free and voluntary.
In Robinson v. State, 247 Miss. 609, 613, 157 So.2d 49, 51 (1963), we held a confession was inadmissible as evidence after the defendant had been told the "best thing to do is come square with the State, of the City, whoever the crime was against," and that the others implicated had confessed, and "the thing to do is to be square with yourself, not only with us but with the Man Upstairs, and if you don't do that, you are not trying to help yourself." We stated:
The question before the Court is whether there was a promise or an inducement offered to defendant if he confessed. The test in such cases is whether the inducement is of a nature calculated under the circumstances to induce a confession irrespective of its truth or falsity; a mere exhortation or adjuration to speak the truth will not exclude a confession, but where such adjuration is accomplished by an expression that it would be better for the accused to tell the truth, some courts have refused to admit such confession.
157 So.2d at 51.
In Agee v. State, 185 So.2d 671, 674 ((Miss. 1966), we held: "A confession made after the accused has been offered some hope of reward if he will confess or tell the truth cannot be said to be voluntary."
In Miller v. State, 243 So.2d 558 (Miss. 1971), the defendant was arrested for stealing a calf. Following his arrest the sheriff told the defendant and his mother, who wanted to get him out of jail, that he would let the boy go to the house, to be back the next morning, "and he might better tell the truth about the thing, he would be better off." The next morning the defendant returned and confessed the theft. We held:
Although the statement made by the sheriff that the appellant would be better off by telling the truth was probably not intended as an inducement, yet, when it is considered under the circumstances in which it was made, we conclude it very probable that the statement caused the appellant to confess. Some of these circumstances were that the appellant was a twenty-year-old Negro youth of previous good reputation, having never been incarcerated before, who was desirous of being released from jail. These factors, when considered with the additional fact that the sheriff is the highest officer of the county, a representative of the State, speaking in his official capacity to a youth accused of a crime, cast such doubt upon the confession as to render it inadmissible in evidence. We are of the opinion the confession was not voluntarily made and that its admission constitutes reversible error.
Id. at 559.
In the recent case of Layne v. State, 542 So.2d 237 (Miss. 1989), we were troubled by a patrolman's telling the accused that "the best policy would be to tell the truth." However, at the suppression hearing, the defendant offered no evidence that this statement made to him by the patrolman had anything to do with his confession.
*46 We give great deference to the finding of a circuit judge that a confession was freely and voluntarily made, it being his function at the trial level to make this determination. Frost v. State, 483 So.2d 1345, 1350 (Miss. 1986); Layne v. State, supra. We must hold in this case, however, that the learned judge erred in admitting the confession.
This case is analogous to Miller v. State, supra. Dunn was personally acquainted with Grisham, worked with Mrs. Grisham at the hospital, and obviously had a great deal of confidence and trust in this officer. We can only conclude that under the circumstances of this case the statements made to Dunn, especially that he "would do what ever was legal with my realms to help," induced the confessions. And, contrary to Layne v. State, Dunn testified that Grisham's statements were an inducement to his confessions.
The confessions being inadmissible, this cause is reversed and remanded.
REVERSED AND REMANDED.
ROY NOBLE LEE, C.J., DAN M. LEE, P.J., and PRATHER, ROBERTSON, SULLIVAN, PITTMAN and BLASS, JJ., concur.
ANDERSON, J., dissents without written opinion.