IN THE SUPREME COURT OF MISSISSIPPI
NO. 92-KA-01127-SCT

*DARYL LEONARD MORGAN*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/01/92 |
| TRIAL JUDGE: | HON. FRANK ALLISON RUSSELL |
| COURT FROM WHICH APPEALED: | LEE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | MICHAEL G. THORNE |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: SCOTT STUART |
| DISTRICT ATTORNEY: | JOHN R. YOUNG |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 8/15/96 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 9/5/96 |

**EN BANC.**

**DAN LEE, CHIEF JUSTICE, FOR THE COURT:**

¶1. Appellant, Daryl Leonard Morgan, was tried in the Lee County Circuit Court and convicted of the murder and armed robbery of Junior Dean Franks. Morgan filed his motions for post-trial relief and these motions were denied. Morgan, aggrieved by his conviction, appeals to this Court and assigns the following errors:

> **I. THE TRIAL COURT ERRED IN NOT GRANTING THE DEFENDANT'S MOTION TO SUPPRESS AND RELATED MOTION *ORE TENUS*, THEREBY ALLOWING THE PROSECUTION TO PRESENT EVIDENCE THAT WAS OBTAINED IN VIOLATION OF THE CONSTITUTIONAL RIGHTS OF THE DEFENDANT**

> **II. THE TRIAL COURT ERRED IN DENYING THE DEFENDANT'S MOTION FOR CHANGE OF VENUE, AS THE PUBLIC HAD BEEN SUBJECTED TO EXTENSIVE PRETRIAL PUBLICITY WHICH OVERSHADOWED THE DEFENDANT'S RIGHT TO BE TRIED BY A FAIR AND IMPARTIAL JURY**

> **III. THE TRIAL COURT ERRED IN DENYING THE DEFENDANT'S MOTION FOR**

**JUDGMENT OF ACQUITTAL JNOV OR NEW TRIAL, AS THE VERDICT WAS AGAINST THE SUBSTANTIAL WEIGHT OF THE EVIDENCE**

¶2. After carefully reviewing the record and the applicable case law, we find that Morgan is entitled to no relief on these assignments of error.

## STATEMENT OF THE CASE

¶3. Morgan was arrested on July 11, 1991, for the June 26, 1991, murder of Junior Dean Franks. The next day, July 12, Morgan was taken before a Justice Court Judge for his initial appearance. Subsequently, a Lee County grand jury indicted Morgan and Christopher Thomas on August 28, 1992, for the murder and armed robbery of Franks.

¶4. Morgan filed a motion requesting a change of venue. A hearing was conducted to determine the merits of Morgan's request, and thereafter the trial judge held that Morgan had not demonstrated that a change of venue was required. However, the trial judge indicated that if during voir dire it became apparent that there was a need to reconsider his denial of Morgan's motion, he would do so.

¶5. In addition to his request for a change of venue, Morgan filed a motion to suppress a videotaped and written statement that he had given to the Tupelo Police Department on July 12, 1991. A suppression hearing was held and the trial judge subsequently denied Morgan's request that the statements be suppressed.

¶6. Morgan's trial commenced on September 29, 1992, and after all the evidence was submitted, a Lee County jury found Morgan guilty of one count of murder and one count of armed robbery. Morgan timely filed his post-trial motions, and the trial judge overruled these motions. Thereafter, Morgan filed his notice of appeal with this Court.

## STATEMENT OF THE FACTS

¶7. Junior Dean Franks was found at 11:26 p.m. on June 26, 1991, lying in the street at the Crosstown intersection in Tupelo. Tupelo Police Officer Preston Irving discovered that Franks had been shot in the neck, and he called an ambulance to transport Franks to a local hospital. Franks was transported to the hospital but later died as a result of his gunshot injury. No arrests were made at this time for Franks' murder.

¶8. Meanwhile, 16-year-old Daryl Leonard Morgan had been arrested on or about June 27, 1991, for a burglary that had been committed in Mooreville. Morgan was being held in the Lee County jail on the burglary charge when he was approached on June 28, 1991, by Tupelo Police Detective Robert Hall and asked if he had heard anything about Franks' murder.

¶9. Apparently, Morgan had given the police reliable information in the past regarding another criminal matter, and Hall hoped that Morgan might have heard something about the Franks' shooting. During the course of his conversation with Morgan, Hall testified that Morgan stated something about the Franks murder that was not widely known. That is, Morgan apparently indicated that Franks was shot with a "six spinner," i.e., a revolver. At this point in time, Hall ceased his conversation with Morgan because he then became a suspect in the Franks murder. Hall received a call on June 30, 1991, from a confidential informant in the Hillsdale neighborhood (Morgan lived in

the Hillsdale area) who stated that "Christopher Thomas was going around saying Daryl [Morgan] was the one that shot the man at Crosstown."

¶10. Hall and Detective Green of the Tupelo Police Department then went to the Hillsdale area and talked to Thomas and his mother. Thomas denied bragging about Morgan's involvement in Franks' murder and told the detectives that he knew nothing about the shooting. Thomas told the police that he was with Rochelle Rogers and Steve Hurst on the night Franks was murdered. Thereafter, Hall and Green questioned Hurst and Rogers and were informed by them that Thomas was not at their house on the night Franks was murdered. Subsequently, Detective Hall and Detective Cliff Hardy spoke with Thomas on July 11, 1991, and confronted him with his false story. Hall testified that at this time Thomas was questioned as a potential witness to the killing.

¶11. Thomas told the detectives that he lied because he was afraid and that Morgan killed Franks. At this point the detectives ceased their questioning of Thomas. Thomas' sister was brought in and was present when Thomas was again questioned and at this point he gave a videotaped confession.

¶12. As a result of Thomas' statements made to Detective Hall, Morgan was arrested by warrant on July 11, 1991, for the murder of Franks. The next morning Morgan was questioned by Detective Hall, Detective Cliff Hardy and Detective Bart Aquirre. Also present during this questioning was Morgan's mother, Carolyn. Morgan was informed of his *Miranda* rights, and his rights were individually explained to him and his mother. Thereafter, Morgan signed a waiver of rights form.

¶13. Morgan gave a videotaped confession in which he admitted shooting Franks during a botched robbery attempt at a Tupelo laundromat. After giving the videotaped confession, Morgan was taken to another part of the police station where he gave an oral statement that was typed by Detective Aquirre. Morgan signed and initialed the written statement.

¶14. After giving the videotaped confession and signing the written statement and after his processing was completed, Morgan was taken before a magistrate where he was provided an attorney. Later, Morgan filed a motion to suppress his videotaped and written confessions. At the suppression hearing, Morgan argued that the statement was coerced and that it was not knowingly, voluntarily and intelligently made. The lower court heard testimony from Detective Bart Aquirre, Detective Robert Hall, Morgan and his mother Carolyn.

¶15. Detective Hall testified that he had talked to Morgan on the 28th of June and that he had not interrogated him thereafter until July 12, 1991. Hall testified that Morgan never asked for an attorney. Hall did admit that he might have spoken to Morgan between June 28, 1991, and July 11, 1991, but that this contact was limited to Morgan's "hollering out the window [of the jail]" at him.

¶16. Detective Aquirre testified that he first spoke with Morgan on the morning of July 12, 1991, and that he had informed Morgan of his *Miranda* rights before talking to him. Aquirre further testified that Morgan's mother was present and that he explained Morgan's rights to Morgan and his mother. He testified that it appeared to him that Daryl Morgan and his mother, Carolyn, understood the waiver of rights form that was read to them. Aquirre also testified that there were no promises made to Morgan or threats directed at Morgan to obtain his confession.

¶17. At the suppression hearing, Morgan testified that he had asked for an attorney on June 28, 1991,

and July 11, 1991, and that he was told that there were no attorneys available. Moreover, Morgan testified that he did not understand his rights because he could not read and that he was coerced into signing the rights waiver form. Morgan testified that Detective Hall threatened to use his blackjack if he did not cooperate. Morgan did, however, testify that he was not promised anything to gain his confession.

¶18. The trial judge, after hearing all of the testimony and viewing the witnesses and their demeanor, found that Morgan's confession had been knowingly, voluntarily and intelligently made and therefore the confessions would be admissible. The lower court also denied Morgan's change of venue motion.

¶19. Morgan's trial began on September 29, 1992, and the prosecution called five witnesses. Detective Bart Aquirre testified that Morgan confessed to the murder, and Christopher Thomas testified that Morgan shot Franks after a failed attempt to rob Franks of his truck. Frances Lusk, another prosecution witness, testified that Daryl Morgan had stated to her at approximately 5:00 p.m. on June 26, 1991, that "he was going to kill him a [person]."[1]

¶20. Morgan took the stand in his defense and denied killing Franks. In fact, Morgan testified that he was not with Thomas on the night of the murder but instead was with Michael Moffet until approximately 10:15 p.m. to 10:30 p.m. Morgan testified that he left Moffett's apartment and then went to the apartment of his girlfriend, Alene Walker, and stayed there until 1:00 a.m. Michael Moffett corroborated Morgan's testimony and testified that Morgan was at his apartment eating fish until approximately 10:30 p.m., after which Morgan left Moffett's apartment to go to Alene Walker's apartment. There was no corroborating testimony from Alene Walker.

¶21. After all of the testimony was given, the jury was instructed on the law and excused to begin its deliberations. The jury returned a guilty verdict on the murder charge and the armed robbery charge. However, the jury was unable to agree on a life sentence on the armed robbery charge, so the trial judge sentenced Morgan to serve a term of forty-five years on that charge. The trial judge ordered that the life imprisonment sentence for the murder of Junior Dean Franks and the forty-five years for the armed robbery charge run consecutively.

**DISCUSSION**

### I. THE TRIAL COURT ERRED IN NOT GRANTING THE DEFENDANT'S MOTION TO SUPPRESS AND RELATED MOTION *ORE TENUS*, THEREBY ALLOWING THE PROSECUTION TO PRESENT EVIDENCE THAT WAS OBTAINED IN VIOLATION OF THE CONSTITUTIONAL RIGHTS OF THE DEFENDANT

¶22. Morgan spends the majority of his brief on this issue, pointing out the conflicts in the parties' recollections of events that transpired between June 28, 1991 to July 12, 1991. Morgan's brief and the State's brief illustrate the wide gulf between both sides' testimony given at trial and at the suppression hearing. The basic issue here is whether Morgan's videotaped confession given on July 12, 1991, and his subsequent typewritten confession of that same day were knowingly, voluntarily and intelligently made for purposes of the United States Constitution and the Mississippi Constitution of 1890.

¶23. The general rule is that for a confession to be admissible it must have been given voluntarily and not given as a result of promises, threats or inducements. *Chase v. State*, 645 So. 2d 829, 838-39 (Miss. 1994) (citing *Layne v. State*, 542 So. 2d 237, 240 (Miss. 1989)). In this case Morgan alleged that his confession was coerced and, thus, he secured a due process entitlement to a reliable determination that his confession was not given as a result of coercion, inducement, or promises. *Abram v. State*, 606 So. 2d 1015, 1031 (Miss. 1992). Clearly, the prosecution shoulders the burden of proving beyond a reasonable doubt that the confession was voluntary. *Haymer v. State*, 613 So. 2d 837, 839 (Miss. 1993). The "burden is met and a prima facie case made out by testimony of an officer, or other persons having knowledge of the facts, that the confession was voluntarily made without threats, coercion, or offer of reward." *Chase*, 645 So. 2d at 838 (quoting *Cox v. State*, 586 So. 2d 761, 763 (Miss. 1991)).

¶24. In *Stokes v. State*, 548 So. 2d 118, 122 (Miss. 1989), we held that when the circuit court expressly or implicitly resolves the issue of admissibility of a confession against a defendant, our scope of review is confined to the established limits. In *Alexander v. State*, 610 So. 2d 320, 326 (Miss. 1992) (internal citations omitted), this Court set out the standard of review on voluntariness of confessions:

> This is essentially a fact-finding function. So long as the court applies the correct legal standards, "we will not overturn a finding of fact made by a trial judge unless it be clearly erroneous." Where, on conflicting evidence, the court makes such findings this Court generally must affirm.

¶25. Morgan was brought to the police station by Detective Hall from the Lee County Jail before lunchtime on July 12, 1991. Detective Hall testified that he discussed the pending burglary charge with Morgan and discussed other legal problems that Morgan had in Coahoma County. Morgan was then fed lunch while his mother was brought to the police station. After Morgan finished his lunch, he was taken to a room with a video camera and in the presence of his mother, Detective Hall, Detective Cliff Gordon and Detective Aquirre, he was read his *Miranda* rights. Morgan was asked if he would sign a waiver of his right against self-incrimination and he stated that he would. Aquirre read the waiver of rights form to Morgan, questioned Morgan and his mother as to their understanding of the rights and then presented the waiver form to Morgan so that he and his mother could look over the form. Morgan's mother told him that the form contained the same rights that had just been explained to him by Aquirre. Morgan signed the waiver of rights form, and thereafter Morgan was questioned as to the killing of Junior Dean Franks. Ultimately, Morgan admitted to shooting Franks on the night of June 26, 1991.

¶26. Not surprisingly, Morgan's story differs significantly from the detectives. Morgan claims that he asked for an attorney on June 28, 1991, and on July 11, 1991, but was told that none was available. Detective Hall denies that Morgan asked for an attorney. Likewise, Detective Cliff Hardy also denies that Morgan asked for an attorney. When told by Detective Aquirre on July 12 that he had the right to have an attorney present during questioning and that he could stop answering questions at any time and have an attorney appointed, Morgan did not ask for an attorney nor did he indicate that he had previously asked for an attorney.

¶27. Morgan claims that he cannot read and that he could not understand the waiver form offered to

him by Detective Aquirre. The videotape supports Morgan insofar as his claim of illiteracy. However, the tape demonstrates that Detective Aquirre verbally explained to Morgan and his mother each of the rights contained on the waiver form and asked them if they understood these rights. Morgan and his mother answered in the affirmative.

¶28. Morgan also claims that he was threatened by Detective Hall and told that he would be struck with Hall's blackjack if he did not tell the truth. Hall denied this allegation. Notably, Morgan did not mention Hall's alleged threat during the videotaping while in the presence of his mother, and Morgan stated on tape that his confession was not the result of threats or coercion.

¶29. Morgan's first assignment of error weaves three arguments into one as to why the lower court erred in allowing the admission of his confessions into evidence. First, Morgan argues that Detective Bart Aquirre's statement during the videotaping of his confession was improper and induced his confession. Next, he argues that his waiver of rights was not knowingly and intelligently made. And finally, he argues that his confessions were a result of police threats.

¶30. On appeal, Morgan argues that his confession was unlawfully induced by Detective Aquirre's comment that Morgan should tell the truth and that "the truth shall set you free." Morgan argues that this statement was highly improper and merits a reversal of his conviction. The trial judge, in ruling Morgan's confessions admissible, chastised Aquirre for making the "truth shall set you free" comment and said:

> [I]t is highly improper for an investigating officer to make a statement such as was made on this video "that the truth will set you free." And I would admonish those taking statements in the future to refrain from making any statement of that nature to a suspect or defendant upon interrogating that person. It is not the intent of the speaker that has a bearing on whether or not one envisions that they will receive leniency if they give a statement. It is what is comprehended and understood by the one being interrogated, and that is highly improper. However, this Defendant testified that he wasn't promised anything. He didn't think he would get out of jail if he gave the statement. Furthermore, the remark made by Detective Aquirre, was made, not at the beginning of statement but over towards the end thereof, after the Defendant had admitted the shooting. So, the Court finds that the Defendant was duly and properly advised of his Miranda warnings, and rights under Miranda, and that thereafter, he freely and voluntarily gave the statement without any threat as he has testified to, and without any promises or coercion.

¶31. Morgan relies on *Miller v. State*, 243 So. 2d 558, 559 (Miss. 1971), and *Dunn v. State*, 547 So. 2d 42 (Miss. 1989), to support his argument that Aquirre's statement was improper and tainted the "voluntariness" of his confession. In *Miller*, this Court reversed the trial court's determination that the defendant's confession was voluntary when the defendant was told by the sheriff that "it would be better for him to tell the truth about the thing." *Miller*, 243 So. 2d at 559.

¶32. In *Dunn*, the defendant was induced to confess by a police officer with whom the defendant was personally acquainted and whom the defendant had great trust and confidence in. The officer told the defendant that he "would do what ever was legal with [sic] my realms to help." *Dunn*, 547 So. 2d at 46. On appeal, based in part upon the above facts and relying up the defendant's good reputation, we held that the trial court erred in refusing to suppress the defendant's confession.

¶33. In the case *sub judice*, Morgan, like the defendants in ***Miller*** and ***Dunn***, was young when he confessed. However, unlike the defendant in ***Miller*** and ***Dunn***, Morgan had a history of legal problems and has had an opportunity to become familiar with the criminal justice system. Furthermore, Morgan, unlike the defendant in ***Dunn***, did not know the detective [Aquirre] he confessed to and there was no testimony to indicate that Morgan placed trust or confidence in Aquirre. Moreover, and most importantly, Morgan testified that he was not offered any promises or inducements to make the written or videotaped confessions. In the case *sub judice*, the questionable remark made by Detective Aquirre came well after Morgan had confessed to shooting Franks. Accordingly, the trial judge's finding that Aquirre's statement did not lead to Morgan's confession is supported by Morgan's own testimony and, thus, ***Miller*** and ***Dunn*** are not dispositive to this case.

¶34. Next, Morgan offers his testimony from the suppression hearing to demonstrate that he did not understand his *Miranda* rights. Specifically, Morgan claims that he did not understand the meaning of the word "silent." Notwithstanding Morgan's claim, during cross-examination Morgan stated that he understood that he had the right to stop answering questions but that right was not read to him. A check of Morgan's videotaped confession indicates that Aquirre did explain to Morgan that he could stop answering questions at any time and have an attorney appointed. Morgan indicated on the tape that he understood this right. The trial judge, confronted with this and several discrepancies in Morgan's testimony as to which rights were read to him and which ones were not, apparently chose to disbelieve much if not all of Morgan's testimony. The trial judge found that Morgan's videotaped and written confessions were admissible. We find that the trial judge's findings were supported by substantial evidence and are thus not reversible.

¶35. Finally, Morgan claims that his confessions were the result of a threat he received from Detective Hall on the morning of July 12, 1991, and thus were not made voluntarily. Morgan claims that this threat was made in the presence of Detective Cliff Hardy and Detective Sammy Green. In ***Agee v. State***, 185 So. 2d 671, 673 (Miss. 1966), we stated the following rule for proving the voluntariness of a confession when the defendant alleges that threats were used to obtain the confession:

> The State has the burden of proving the voluntariness of a confession. This burden is met by the testimony of an officer, or other person having knowledge of the facts, that the confession was voluntarily made without any threats, coercion, or offer of reward. This makes out a prima facie case for the State on the question of voluntariness. When objection is made to the introduction of the confession, the accused is entitled to a preliminary hearing on the question of the admissibility of the confession. This hearing is conducted in the absence of the jury. Lee v. State, supra, is also authority for the proposition that when, after the State has made out a prima facie case as to the voluntariness of the confession, the accused offers testimony that violence, threats of violence, or offers of reward induced the confession, then the State must offer all the officers who were present when the accused was questioned and when the confession was signed, or give an adequate reason for the absence of any such witness.

Morgan testified that, on the morning of July 12, 1991, in the presence of Detectives Hardy and Green, Hall made the alleged threat to hit him with his blackjack. Hardy and Green denied Morgan's claim that Hall had threatened Morgan.

¶36. The prosecution was charged under *Agee* with putting all of the detectives on the stand who were present when Detective Hall allegedly threatened Morgan. The prosecution satisfied this requirement. We have held that "the resolution of conflicting testimony regarding voluntariness is a question of fact to be resolved by the trial judge at the suppression hearing." *Chase*, 645 So. 2d at 841 (quoting *Smith v. State*, 465 So. 2d 999, 1002 (Miss. 1985)). When determining voluntariness, the court must look at the "totality of the circumstances" surrounding the statement. *Id.* In this case there was conflicting testimony as to the alleged threat visited upon Morgan by Detective Hall. Morgan claims that the threat was made, and the detectives all deny that the threat was made. The trial judge credited the detectives' testimony and there was substantial credible evidence to support his determination. Therefore, Morgan merits no relief on this claim. *See Veal v. State*, 585 So. 2d 693, 697 (Miss. 1991) (this Court will not reverse trial court on conflicting testimony as to whether coercion used to obtain confession).

¶37. Finally, Morgan argues that the lower court erred when it overruled his *ore tenus* motion to suppress his confessions because he was not afforded a timely initial appearance. Morgan was arrested by warrant at approximately 6:46 p.m. on July 11, 1991, for the murder of Franks. Morgan was not taken before the magistrate for his initial appearance until approximately 6:00 p.m. the following day.

¶38. Rule 1.04 of the Mississippi Uniform Criminal Rules of Circuit Court Practice provides that "every arrested person shall be taken before a judicial officer without unnecessary delay" for his initial appearance. At the initial appearance, the judicial officer is directed to inform the accused that he is not required to speak and that any statements he makes may be used against him. The accused is also informed that he has the right to the assistance of counsel and that, if he cannot afford an attorney, one will be appointed to represent him. Finally, the accused is told that he has the right to communicate with counsel, family or friends. *Veal v. State*, 585 So. 2d 693, 698 (Miss. 1991).

¶39. As previously stated, Morgan was arrested by warrant on July 11, 1991, while he was jailed at the Lee County Jail. Morgan was served with his arrest warrant but was not questioned on July 11, 1991. The next morning he was brought from the Lee County Jail to the Tupelo Police Department. While at the Tupelo police department, Morgan was informed of his right to remain silent and that anything he said would be used against him. He was informed that he had the right to have an attorney present during questioning and that, if he could not afford an attorney, one would be provided for him. Morgan was informed that he could stop answering questions at any time and ask for an attorney. Morgan was asked whether he understood these rights and he indicated that he did. Additionally, Morgan's mother was present during this time. She too was asked if she understood these rights. She indicated that she did.

¶40. In Mississippi, "the right to counsel, both federal and state varieties, attaches at the point in time when 'the initial appearance under Rule 1.04 . . . *ought to have been held . . . .*'" *Veal*, 585 So. 2d at 699 (quoting *Magee v. State*, 542 So. 2d 228, 233 (Miss. 1989)). In the case *sub judice*, Morgan's right to counsel attached on July 11, 1991, when he was arrested by warrant for Franks' murder. *See, e.g.*, *Livingston v. State*, 519 So. 2d 1218, 1220 (Miss. 1988); *Nixon v. State*, 533 So. 2d 1078, 1087 (Miss. 1987). "Once the right to counsel has attached *and been asserted*, the State must of course honor it. This means more than simply that the State cannot prevent the accused from obtaining the assistance of counsel. The Sixth Amendment also imposes on the State an affirmative

obligation to respect and preserve the accused's choice to seek this assistance." ***Maine v. Moulton***, 474 U.S. 159, 170-71 (1985) (emphasis added); *see also **Michigan v. Jackson***, 475 U.S. 625, 635 (1986). In the case *sub judice*, while Morgan's Sixth Amendment right to counsel had attached on July 11, 1991, there was conflicting testimony as to whether he had invoked this right.

¶41. In ***Veal v. State***, 585 So. 2d 693 (Miss. 1991), we were confronted with a similar such situation, and we hold that the precedent therein contained dictates today's result. Veal, like Morgan, had been arrested by warrant before he confessed. *Id.* at 698. Veal, like Morgan, was informed of his *Miranda* rights and he waived those rights. *Id.* at 699. Veal, like Morgan, argued on appeal that the lower court erred in refusing to suppress his confession because the State had unnecessarily delayed his initial appearance to gain a confession. *Id.*

¶42. On appeal we rejected Veal's argument and held that he had been promptly advised of his attached right to counsel, and he clearly and promptly waived that right. *Id.* Accordingly, we found no error in the use of Veal's post-initial appearance confession. *See also **Ormond v. State***, 599 So. 2d 951, 955 (Miss. 1992) (delay in initial appearance "cannot constitute per se reversible error, even when a defendant gives evidence prior to the delayed appearance").

¶43. In the case at bar, Morgan admitted that he was not questioned at all by detectives on the night of his arrest. He did claim that he had asked for an attorney on that night, but Detective Hall denied that he had ever made such a request. The trial judge did not find that Morgan had asked for the appointment of counsel on the murder charge. The videotape and the various witnesses' testimony amply support the trial judge's finding that Morgan was fully advised of his Rule 1.04 (*Miranda*) rights and he promptly waived those rights. The trial judge found that Morgan's July 12, 1991, confessions were admissible because Morgan had been advised of his right to counsel and that he knowingly, intelligently and voluntarily waived this right. We cannot say on appellate review that the lower court's decision was manifestly wrong, and therefore Morgan merits no relief on this assignment of error.

> ## II. THE TRIAL COURT ERRED IN DENYING THE DEFENDANT'S MOTION FOR CHANGE OF VENUE, AS THE PUBLIC HAD BEEN SUBJECTED TO EXTENSIVE PRETRIAL PUBLICITY WHICH OVERSHADOWED THE DEFENDANT'S RIGHT TO BE TRIED BY A FAIR AND IMPARTIAL JURY

¶44. Morgan moved for a change of venue prior to trial, raising a rebuttable presumption that he could not obtain a fair trial in Lee County. The lower court denied Morgan's motion for a change of venue but stated that he would entertain the motion for a change of venue during jury selection if the motion was warranted by the facts. During the jury selection, Morgan once again moved for a change of venue. This motion was once again denied.

¶45. Morgan argues on appeal that the trial court erred in overruling his requests for a change of venue because of the publicity surrounding his case. Accordingly, Morgan contends that his conviction should be reversed and he should be given a new trial.

¶46. Miss. Code Ann. § 99-15-35 (Change of venue; how need shown; grounds) provides as follows:

> On satisfactory showing, in writing, sworn to by the prisoner, made to the court, or to the judge

thereof in vacation, supported by the affidavits of two or more credible persons, that, by reason of prejudgment of the case, or grudge or ill will to the defendant in the public mind, he cannot have a fair and impartial trial in the county where the offense is charged to have been committed, the circuit court, or the judge thereof in vacation, may change the venue in any criminal case to a convenient county, upon such terms, as to the costs in the case, as may be proper.

When the defendant alleges that he cannot obtain an impartial jury without a change of venue, the lower court's decision to deny such a motion is within the trial judge's sound discretion. ***Porter v. State***, 616 So. 2d 899, 905 (Miss. 1993) (citing ***Harris v. State***, 537 So. 2d 1325, 1328 (Miss. 1989) ). Where this discretion has not been abused the decision of the lower court will not be overturned. ***Id.*** (citing ***Shook v. State***, 552 So. 2d 841, 849 (Miss. 1989)).

¶47. Morgan attached five form affidavits to his motion for change of venue. These affidavits indicated that the affiant(s) thought that Morgan could not get a fair trial in Lee County because of ill will toward the defendant. Accordingly, Morgan successfully raised a rebuttable presumption under our statutory law to demonstrate that an impartial jury could not be impaneled. Thus, the prosecution was charged with rebutting the presumption that Morgan could not obtain an impartial jury panel in Lee County. ***Johnson v. State***, 476 So. 2d 1195, 1211 (Miss. 1985).

¶48. Morgan produced two witnesses at the change of venue hearing to demonstrate that he could not get an impartial jury panel in Lee County. First, he called Terry Smith, the news director of WTVA, to the stand. Smith testified that his station covered approximately a 32-county area in North Mississippi and that his station ran approximately three stories on the Franks murder from June 26, 1991, until September 22, 1992. On cross-examination Smith testified that he would consider the three stories an average amount of coverage and that he had not heard a lot of discussion about Morgan's case. Moreover, Smith testified that he was not aware that there was any amount of malice towards Morgan in the Lee County community. Herb Wells was Morgan's next witness. Wells was hired by Morgan to go out into the community and determine whether people had prejudged his case or bore him ill will because of the Franks' murder. Wells testified that the majority of the people he talked with felt like Morgan was involved in a gang and was guilty of Franks' murder.

¶49. The prosecution called several witnesses to rebut Morgan's case. First, the prosecution called Lee County Chancery Clerk Bill Benson. Benson testified that he came into regular contact with the citizens of Lee County and that Morgan's case was not a topic of general conversation. Likewise, Benson testified that he was not aware that Morgan's case had been prejudged. Lee County District One Supervisor Billy Davis was the next witness called by the prosecution. Davis testified that he spoke with people on a daily basis throughout Lee County and that the Franks' murder had not been discussed except right after it happened. Further, Davis testified that he had heard of no ill will towards Morgan.

¶50. The State's next witness was Lee County Tax Assessor Kerrie Weathers. Weathers, like Davis and Benson before him, testified that he had daily contact with Lee County citizens and that he had not heard a lot of discussion about Franks' death. He also testified that he was unaware of any ill will the community harbored towards Morgan. Charles Dillard, the Lee County Tax Collector, testified much the same way as did his predecessors. Dillard testified that there had not been a lot of

discussion about Franks' murder and that he was not aware of any community ill will towards Morgan. Finally, the prosecution called Louis McGee. McGee is employed by the Lee County Board of Supervisors and is a pastor at the New Bethel Missionary Baptist Church in Plantersville. McGee's testimony mirrored the other witnesses' testimony and he testified that he thought that Morgan could get a fair trial in Lee County.

¶51. After hearing all of the testimony , the trial judge ruled that "the proof does not meet the required proof necessary to sustain the Motion for Change of Venue." However, the trial judge stated that he would allow Morgan to raise the issue again at, during, or after voir dire.

¶52. Morgan suggests that, under the facts of this case, he raised an irrebuttable presumption of impartiality, and therefore the trial judge should have granted his request for a change of venue. In *White v. State*, 495 So. 2d 1346, 1349 (Miss. 1986), this Court announced the following elements which should serve to indicate an irrebuttable presumption of prejudice:

> (1) Capital cases based on considerations of a heightened standard of review;

> (2) Crowds threatening violence towards the accused;

> (3) An inordinate amount of media coverage, particularly in cases of

> (a) serious crimes against influential families;

> (b) serious crimes against public officials;

> (c) serial crimes;

> (d) crimes committed by a black defendant upon a white victim;

> (e) where there is an inexperienced trial counsel.

Morgan argues that he meets three of the above guidelines. First, he argues that he is a black man accused of killing a white man. Second, there was existing community prejudice against persons believed to be a member of a gang. Third, the trial was of a capital nature at the onset and all pretrial publicity referenced this fact.

¶53. Morgan is correct on his first assertion. He is black and Franks was white. Next, Morgan argues that there was a general prejudice against gang members and this case was perceived as a gang case. Notwithstanding Morgan's argument, the record just does not support his assertion. His own affidavits submitted with his Motion for Change of Venue do not even indicate that the affiants felt that Morgan could not get a fair trial because of his reputed gang membership. Finally, this case did start off as a capital murder case but was not pursued as a capital murder case, and the testimony of various witnesses did not indicate that this case was a high profile case because it had once been a capital murder case.

¶54. Finally, Morgan argues that twelve of the venire members had formed an opinion about this case and could not set aside their opinion. A search of the record indicates that twelve venire members indicated that they had read or heard about the story through a news story. Of those twelve venire members, nine indicated that they could not set aside what they had read or heard. Two indicated that

they could and one indicated that he would be more lenient on Morgan. Other venire members indicated that they either knew the victim or knew the defendant and felt that this might hinder their impartiality.

¶55. The presumption of prejudice may be rebutted by the State's demonstration that an impartial jury was actually impaneled. *Harris v. State*, 537 So. 2d 1325, 1328-29 (Miss. 1989). In this case none of the twelve jurors who served on Morgan's case indicated that they had read about Morgan's case or formed an opinion one way or the other about his innocence *vel non*. Accordingly, we find nothing in the record which would indicate that Morgan's jury was not fair and impartial.

¶56. Based upon the testimony in the record, we hold that the trial judge did not abuse his discretion when he overruled Morgan's motion for change of venue. The witnesses, save one, indicated that there had not been a lot of discussion about the case, and all save one indicated that they were aware of no ill will or malice harbored by the residents of Lee County towards Morgan. Accordingly, this assignment of error merits Morgan no relief.

### III. THE TRIAL COURT ERRED IN DENYING THE DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL JNOV OR NEW TRIAL, AS THE VERDICT WAS AGAINST THE SUBSTANTIAL WEIGHT OF THE EVIDENCE

¶57. Morgan argues that the evidence was insufficient as a matter of law to support a guilty verdict and, therefore, the trial court erred in refusing his Motion for JNOV or New Trial. Specifically, Morgan argues that Chris Thomas' testimony was biased, and Morgan points to the fact that the State cut a deal with Thomas to get him to testify against Morgan. Furthermore, Morgan argues that his taped confession was inconsistent and indicated that he did not commit the murder. Finally, Morgan argues that his conviction should be reversed because Thomas' testimony was substantially impeached.

¶58. When this Court reviews the sufficiency of the evidence, we look to all of the evidence before the jurors to determine whether or not a reasonable, hypothetical juror could find, beyond a reasonable doubt, that the defendant is guilty. *Jackson v. State*, 614 So. 2d 965, 972 (Miss. 1993). The evidence which supports the verdict is accepted as true, and the State is given the benefit of all reasonable inferences flowing from that evidence. *Id.* (citing *Hammond v. State*, 465 So. 2d 1031, 1035 (Miss. 1985)). We will not reverse a trial judge's denial of a motion for a new trial unless we are convinced that the verdict is so contrary to the weight of the evidence that, if it is allowed to stand, it would sanction an unconscionable injustice. *Groseclose v. State*, 440 So. 2d 297, 300 (Miss. 1983).

¶59. In the case at bar, the jury was made well aware of the fact that Thomas had cut a deal with the State so that he would get a lesser sentence if he testified against Morgan. Accordingly, the jury was aware that Thomas' credibility was called into question by the deal he received from the State for his testimony against Morgan. It goes without saying that the jury is the final arbiter of a witness's credibility. *Harris v. State*, 527 So. 647, 649 (Miss. 1988). Here, the jury simply chose to believe Thomas' story and disbelieve Morgan's story.

¶60. Morgan, citing *Fleming v. State*, 604 So. 2d 280 (Miss. 1992), argues that he can only be convicted on the uncorroborated testimony of an accomplice when the testimony is reasonable and not improbable, self-contradictory, substantially impeached. Morgan claims that Thomas' story was

seriously impeached and therefore was insufficient to sustain his conviction. Morgan's argument misses an important point. Thomas' testimony was not uncorroborated. Morgan's July 12, 1991, confession corroborates much of Thomas' testimony. There are some discrepancies between their testimony. However, we have stated that minor conflicts in testimony are not unusual. *Jackson*, 614 So. 2d at 972 (citing *Young v. State*, 420 So. 2d 1055, 1057 (Miss. 1982)). The jury could infer that the differences between Morgan's and Thomas' testimony was due to the fact that both men had been drinking on the night of Franks' murder. Certainly the jurors could infer that the alcohol they consumed on the night of the murder had clouded their memories of the events.

¶61. Morgan confessed to shooting Franks in the neck with a revolver. Chris Thomas verified this story. When we couple this testimony with the other trial testimony we hold that the jury's verdict was not against the substantial weight of the evidence and that the trial judge did not abuse his discretion in refusing to grant Morgan's JNOV or Motion for a New Trial. *Veal v. State*, 585 So. 2d 693, 695 (Miss. 1991). Accordingly, Morgan merits no relief on this issue.

## CONCLUSION

¶62. The trial court was not manifestly wrong in deciding that Morgan's waiver of his Sixth Amendment right to counsel was voluntarily, intelligently and knowingly made. Likewise, the trial judge did not abuse his discretion when he denied Morgan's request for a change of venue. Morgan has presented this Court with no reason to doubt that the jury impaneled in this case was impartial. *Harris v. State*, 537 So. 2d 1325, 1328-29 (Miss. 1989). Finally, the lower court did not abuse its discretion in denying Morgan's request for a JNOV or, in the alternative, Motion for New Trial. Morgan's conviction was supported by his own confession and by an accomplice's testimony. This is substantial evidence which would allow a reasonable hypothetical juror to find that Morgan killed and attempted to rob Junior Dean Franks. Accordingly, Morgan's conviction for murder and armed robbery is hereby affirmed.

¶63. **COUNT I: CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED. COUNT II: CONVICTION OF ARMED ROBBERY AND SENTENCE OF FORTY-FIVE (45) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED. SAID SENTENCE IN COUNT II SHALL RUN CONSECUTIVELY WITH THE SENTENCE IN COUNT I.**

**PRATHER AND SULLIVAN, P.JJ., PITTMAN, BANKS, ROBERTS, SMITH AND MILLS, JJ., CONCUR. McRAE, J., DISSENTS WITH SEPARATE WRITTEN OPINION.**

**McRAE, JUSTICE, DISSENTING:**

¶64. Our Constitution and laws provide greater protection for minors since they are designated as lacking the experience and emotional or mental maturity of the ordinary average adult. Because the legally recognized disability of minority is directly related to a child's ability to make an informed

decision, I cannot agree with the majoritys' decision to allow police officers to treat children as adults in determining whether the accused knowingly and intelligently waived his constitutional rights prior to police interrogation. Surely when it comes to taking away a minor's liberties, this Court should provide the same protection required for minors in the civil context and most other areas of the law. This particular injustice in Morgan's case was aggravated further by the presence of his mother in the interrogation room, and the interrogating officer's statement, "*the truth shall set you free.*"

¶65. The majority concludes that Morgan waived his rights under ***Miranda v. Arizona***, 384 U.S. 436 (1966), simply by signing a waiver form after being read his rights prior to interrogation. For Morgan to make an effective waiver of his rights, however, it must be shown that he voluntarily entered the waiver, and that it was not the result of promises, threats, or inducements. ***Chase v. State***, 645 So. 2d 829, 838-39 (Miss.1994) (citing ***Layne v. State***, 542 So.2d 237, 240 (Miss.1989)). The burden of proving beyond a reasonable doubt that the waiver and subsequent confession were voluntary is on the prosecution. ***Haymer v. State***, 613 So. 2d 837, 839 (Miss.1993).

¶66. One factor always suggesting the inadmissability of a confession is the age of the accused. ***In Interest of W.R.A.***, 481 So. 2d 280, 286 (Miss. 1985). The consideration of age in determining the issue of waiver is entirely consistent with this State's jurisprudence governing minors. In Mississippi, we have consistently held that minors do not have the requisite maturity to make many important decisions affecting their lives. For example, Miss. Code Ann. §97-5-21 (1994) makes it a crime to "seduce and have illicit connection with any child younger than such person and under the age of (18) eighteen years." The non-minor is held accountable regardless of the minor's consent to the act itself, no matter how "street wise" the child involved is. The Mississippi Code also proscribes fondling of a child under the age of (14) fourteen years "with or without the child's consent." Miss. Code Ann. §97-5-23 (1994).

¶67. In the civil context, children below a certain age cannot legally enter into contracts, buy or sell property, vote, maintain a residence or even choose the parent with which to live after a divorce. Minors are considered incapable of making such decisions because of their lack of mental maturity. Thus, they are shielded from harm by laws prohibiting them from purchasing tobacco or alcohol or entering places such as casinos and other venues of "adult" entertainment until they reach the age of twenty-one. Since the time of ***Price v. Crone***, 44 Miss. 571 (1870), this Court also has given special protection to the rights of minors. In that case, the Court noted that "it is the duty of the Chancellor to protect the rights of minors, whether the proper defense has been made or not. *Nothing is taken as confessed or waived by the minor or her guardian.*" *Id.* at 575. (emphasis added).

¶68. For purposes of service of process, this Court has held that there can be no waiver by a juvenile of actual service. ***Khoury et al. v. Saik***, 33 So. 2d 616, 618 (Miss.1948). In this holding, this court reasoned that "*minors can waive nothing.* In the law they are helpless, so much so that their representatives can waive nothing for them." *Id.* (emphasis added)

¶69. This rationale spills over into all areas of contract law. When contracts for the sale of land are made by minors, they are voidable at the option of the minor. ***Edmunds v. Mister***, 58 Miss. 765(1881). Generally, an infant has the right to disaffirm a contract of purchase of land even though it has been executed. 43 C.J.S. *Infancy* §138 (1978). In fact, a minor in Mississippi does not have the capacity to bind himself absolutely by a contract. ***Shemper v. Hancock Bank,*** 40 So. 2d 742, 744

(Miss. 1949). This court held in **Shemper** that a minor did not assume liability in a partnership because the partnership was a contractual relationship in which the minor had no capacity to enter. *Id*; *see* Miss. Code Ann. § 93-19-13 (allowing only those individuals over age of eighteen to contract) ; *see also* Miss. Code Ann. §15-3-11 (1972) (setting forth statutory steps for person of majority to ratify contract entered into as minor).

¶70. In recognition of minors' relative inability to act maturely on their own behalf, courts also give special protection to minors in the law of adverse possession. The ten year term provided in our adverse possession statute simply "does not begin to run against minors until the disability of minority has been removed." **Wilder v. Currie,** 95 So.2d 563, 571 (Miss. 1957); *see* Miss. Code Ann. § 15-1-7 (1995). Likewise, the statute of limitations for a minor to bring a personal action is tolled until the disability of minority is removed. Miss. Code Ann. § 15-1-59 (1995). This Court also recognizes the disability and waits until minority is removed to permit the time for taking an appeal to run. M.R.A.P. 4(f). Even when the minor has a guardian ad litem, he is given two years within which to file his appeal to this Court instead of the normal thirty days. *Id.*

¶71. In certain circumstances where the child's interests would be adversely effected by litigation, courts must appoint a guardian ad litem to act for the benefit of a minor child. *See* Miss. Code Ann. § 43-21-121 (1972). The purpose is to protect a child who is incapable of acting for his or her own defense in a knowing and intelligent manner. In **Alack v. Phelps,** 230 So. 2d 789, 792-793 (Miss. 1970) two children, adopted by their grandparents, were allowed to sue, through their guardian, for the wrongful death of their natural father. This Court stated, "children are under the disability of minority and cannot act for themselves" and therefore, "the equity court will protect their rights." *Id.* at 793.

¶72. Although the list of situations in which minors are given special consideration and protection in Mississippi goes on, there are few, if any, situations in which the minor's actions have consequences as pivotal to one's life as a waiver of constitutional rights in the face of serious criminal accusations. Given the protection our courts afford minors in most other areas of the law, Morgan should not have been allowed to enter into such a fundamental decision without more procedural safeguards. The finding of waiver by the majority simply cannot be rationalized in light of the protection we afford minors in all other situations where they lack the mental maturity to make an informed decision.

¶73. Certainly no one would disagree with the proposition that early in a child's development, he is incapable of knowingly and intelligently waiving his rights. The difficulty arises when the courts are asked to draw the line. The quicksand becomes deeper when the child has a lower than average intelligence or education level, and even deeper when he admits to not fully understanding the rights being waived. Such is the reason the line is uniformly drawn in other areas of the law at the age when legal minority is removed. Because the decision to waive the right to remain silent, the right to effective counsel, and the right against self-incrimination is certainly as monumental and potentially life altering as the right to enter into a contract, the protection offered a minor in such a situation should be no less. As stated so succinctly by one of my colleagues, "Who will save the children?" They should not suddenly lose their rights as children after becoming the target of criminal accusations.

¶74. The issue concerning the waiver of this minor's constitutional rights was exacerbated by the presence of his mother during interrogation, and the interrogating officer's statement to him that "the truth shall set you free." The officers claimed that they called Morgan's mother to the interrogation and involved her in the questioning only to comply with the mandates of the Youth Court Act. The State, however, was interrogating Morgan as a suspect in a murder case. Murder is a capital offense and, as such, is outside the jurisdiction of the Youth Court. Miss. Code Ann. §§ 43-21-151(a) and(b) (1993). Why then was Morgan's mother involved? Her involvement can be interpreted in no way other than a deliberate attempt to elicit a statement from Morgan. The officers are not persuasive in their attempt to wrap themselves in the Youth Court Act and claim Morgan's minority status when it works to their advantage, and disclaim that very same status for purposes of waiving his rights under *Miranda*.

¶75. In *Agee v. State,* 185 So.2d 671 (Miss.1966), the interrogating officers called to the courthouse a professor with whom the defendant had a close relationship. This Court held the defendant's confession inadmissible because the professor, through his close relationship, exerted undue pressure on the defendant by his presence and statements made during the interrogation. *Id.* at 674. Although Morgan's mother never asked her son to confess, her presence at the interrogation had a similar effect of exerting pressure on Morgan. His mother even confirmed to her son that the officers completely read his rights, as Morgan could not read. Because of the natural influence exerted over one's child, particularly in this situation, as well as the false sense of security and comfort provided by a parent's presence during interrogation, the officers' use of the mother during interrogation was an improper inducement to confession.

¶76. The presence of Morgan's mother certainly had an enormous impact on the child where the child was subjected to statements such as "the truth shall set you free." Both the United States Supreme Court and this Court have previously addressed the admissibility of similar statements seemingly offering leniency, and have uniformly held that statements of this kind lack the necessary element of voluntariness to be admissible at trial.

¶77. The United States Supreme Court has adhered to this principle since the decision of *Bram v. United States,* 168 U.S. 532, 18 S. Ct. 183, 42 L. Ed. 568 (1897), which held, "a confession can never be received in evidence where the prisoner has been influenced by any threat or promise; for the law can not measure the force of the influence used, or decide upon its effect upon the mind of the prisoner, and therefore excludes the declaration of *any* degree of influence has been exerted."(emphasis added).

¶78. In *Miller v. State,* 243 So.2d 558 (Miss.1971), this Court found improper a sheriff's statement, "it would be best for him to tell the truth about the thing," and reversed the trial court's determination that the defendant's confession was voluntary. *Id.* at 559. This Court held that, even though the statement made by the sheriff was probably not intended as an inducement, it could have caused the appellant to confess when viewed in light of the circumstances in which it was made. Those circumstances included the age of the appellant, his good reputation, and his desire to be released. *Id.*

¶79. As to Morgan's desire to be released, the statement, "the truth shall set you free" is particularly troublesome when made to a defendant who has been sitting in jail for some time. More importantly, Morgan was three years younger than the appellant in *Miller*. His age should weigh heavily against

admissibility of his confession since it certainly affected his ability to make a rational decision when confronted by a law enforcement officer acting in his official capacity and seeming to offer leniency in exchange for a truthful statement. Finally, the officer made this statement in the presence of his mother whom naturally maintained a strong influence over the minor.

¶80. The totality of the circumstances suggested that Morgan would somehow be rewarded or given leniency for making a confession. As concluded in *Miller*, "[a] confession made after the accused has been offered some hope of reward if he will confess or tell the truth cannot be said to be voluntary." *Id.* (quoting *Agee v. State,* 185 So.2d 671, 674 (Miss.1966)); *see Dunn v. State,* 547 So.2d 42, 46 (Miss. 1989) (concluding that officer's statement he "would do what ever was legal within my realm to help" improperly induced confession); *Robinson v. State,* 157 So.2d 49 (Miss. 1963) (reversing conviction where officials elicited confession by "giving defendant opportunity to square with the State, or the City, or whoever the crime was against."); *Matthews v. State,* 59 So. 842 (Miss. 1912) (striking confession where fourteen-year-old boy was told "it would be all right" if he would tell truth about crime); *Mitchell v. State,* 24 So. 312 (Miss. 1898) (holding confession inadmissible where defendant was promised it would make it better if he would tell all about crime).

¶81. The improper statements of the interrogating officers, the misuse of a family member to elicit a confession, and the tender age of the defendant separately rendered Morgan's confession involuntary and warrant reversal. Cumulatively, they are compelling for reversal. Accordingly, I dissent.


1. The prosecution's theory of the case was that Morgan killed Franks because Morgan, who was apparently a member of a gang, had to kill someone to gain a higher "rank" within the gang.