# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2001-KA-00819-SCT

*JASON DANIEL JONES*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 4/6/2000 |
| TRIAL JUDGE: | HON. W. ASHLEY HINES |
| COURT FROM WHICH APPEALED: | WASHINGTON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | WAYNE O'DELL LEE |
| | HOWARD Q. DAVIS, JR. |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JOHN R. HENRY |
| DISTRICT ATTORNEY: | FRANK CARLTON |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 3/27/2003 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE SMITH, P.J., COBB AND DIAZ, JJ.**

**DIAZ, JUSTICE, FOR THE COURT:**

¶1.     This is a criminal appeal from a conviction of capital murder from the Circuit Court of Washington County, Mississippi, Honorable W. Ashley Hines, presiding.  After a 6 day bifurcated trial by jury conducted March 15-20, 1999, Jason Daniel Jones (Jones) was sentenced by the jury to serve a term of life imprisonment without the benefit of probation or parole.

¶2.     Michael Wilkerson (Wilkerson) was brutally murdered in a field in Washington County on January 9, 1998.  Investigation revealed that Jones had previously lived with and worked for Wilkerson, and on

the day of the murder, Jones had left town on a bus. That bus had a scheduled stop in Memphis, Tennessee. Officers from the Washington County Sheriff's Office (WCSO) phoned Memphis authorities and requested that they detain Jones when the bus arrived in Memphis. Jones was arrested in Memphis and later waived extradition back to Mississippi. In Mississippi, Jones confessed and provided officers the details of the crime and led them to substantial evidence later used against him at trial. He also alleged that a man named David Shamoun (Shamoun) hired him to kill Wilkerson and that Shamoun had also participated in Wilkerson's murder. Wilkerson apparently owed money to Shamoun, a financier of his business, and Shamoun had a beneficial interest in a policy of insurance on Wilkerson's life. Jones and Shamoun were both indicted for the murder of Wilkerson.

¶3.     Six issues are now before this Court:

**I.      Whether Jones was arrested in Memphis, Tennessee by Law Enforcement Officers of that City and, if so, if the arrest was supported by probable cause;**
**II.     Whether Law Enforcement Officers of Washington County, Mississippi questioned Jones after he had invoked his privilege against self-incrimination and requested an attorney;**
**III.    Whether the District Attorney acted improperly by meeting with Jones, at Jones's request, before counsel was provided to him;**
**IV.    Whether the State of Mississippi failed to provide Jones with a timely initial appearance;**
**V.     Whether the trial judge erred by not recusing himself; and**
**VI.    Whether the cumulative effect of various other assigned errors deprived Jones his right to a fair trial.**

## FACTS

¶4.     On the afternoon of January 9, 1998, Wilkerson was found dead in a field near Wilmot Road in Washington County, Mississippi. He had sustained numerous stabs and cuts from a knife, including a cut to the throat. In the course of investigating the scene, deputies of the Washington County Sheriff's Office

2

(WCSO) discovered blood in a palm print found in the mud indicating that the person who killed Wilkerson had injured his right hand. Further investigation at the scene led officers to conclude that two individuals were involved in the murder of Wilkerson: one who actually killed him and another who stayed in a car on Wilmot Road. The investigation progressed rapidly and by that same evening deputies had learned that a man named Jason worked for Wilkerson and had been living with him for about a week before the day of the murder. They learned that on that day, Jason had told co-workers he was going home to West Virginia to live with his mother. Deputies were told that Shamoun had given Jason a ride to the bus station. Shamoun was interviewed, and he told WCSO that someone named Jason had been living with Wilkerson. He confirmed that he drove Jason to the bus station, and he gave WCSO a description of Jason. However, the interview was cut short by Shamoun. He became nervous, giving several different versions of when and how he picked Jason up, and stated, "You don't understand how deep in this I am, and I really don't want to make any other statements until I . . . talk to an attorney." Questioning ceased, and Shamoun was allowed to leave.

¶5.     Officers went to the bus station and learned that someone matching Jones's description boarded a bus bound for West Virginia, with a stop in Memphis, Tennessee. WCSO telephoned Memphis Police, gave them the suspect's first name and Shamoun's description of him, and requested they detain him when the bus stopped there. WCSO Officer Doyle Barrett testified that at that time he also told Memphis police about the suspect's possible injury to his right hand; however, a NCIC description sent to Memphis had no mention of the suspect having an injury.[1]

---

[1]Officer Barrett explained at trial that NCIC reports are prepared by dispatchers at the request of investigators and do not have all of the information regarding cases.

¶6.     Memphis police detained Jones, who did have an obvious injury to his right hand, at the bus station. They then informed WCSO of his detention, gave them his full name, and requested an arrest warrant in order to hold Jones until WCSO officers could arrive from Mississippi. WCSO Officer Kelvin McKenzie testified that he prepared an affidavit setting forth what they knew about Jones at the time. According to testimony, WCSO knew the following about Jones when they prepared the affidavit: his full name, that he worked for and lived with the victim, and that he left town the day of the murder, and that the suspect they were looking for and Jones both had injuries to their right hand. However, the record is silent as to how much of this information was included in the affidavit. This affidavit did not include an underlying facts and circumstances sheet and was not produced at trial.[2] Based on the affidavit, WCSO secured an arrest warrant late the night of the murder, which they faxed to Memphis police approximately thirty minutes after Jones had been detained for questioning. WCSO officers then left for Memphis to see if Jones would waive extradition and return to Mississippi.

¶7.     Upon their arrival, WCSO officers interviewed Jones. They noticed that his right hand was bandaged. WCSO officers informed Jones that Wilkerson had been killed. They testified that he showed no emotion. Officer McKenzie began advising Jones of his *Miranda* rights, but Jones interrupted, stating, "I want a lawyer." Officer McKenzie finished reading Jones his rights, whereupon Jones again requested an attorney. Questioning ceased at that point. Before Jones was returned to his cell, however, a Memphis officer asked Officer McKenzie what was wrong with Jones's hand. McKenzie in turn asked Jones, who replied, "I'd rather not discuss that." Because it was their policy to evaluate all injuries before booking persons to ascertain if they needed medical treatment, Jones was required by the Memphis officer to

---

[2]The State attempted to introduce the affidavit that was used to secure Jones's arrest warrant; however, the defense objected on the grounds that it had not been produced to them until a week before trial. The court inquired as to why the State needed it in evidence, and the State withdrew it.

remove the bandage from his hand, revealing a deep cut which Memphis authorities determined did indeed need medical treatment. Jones said he cut the hand at work earlier in the week. WSCO officer McKenzie took two Polaroid photographs of the wound, and Jones was taken to the hospital.

¶8. On Monday, January 12, 1998, WSCO Officers returned to Memphis "to attempt to again interview Jason Jones and ascertain if he w[ould] waive extradition and voluntarily return to Mississippi." Before reaching Memphis, the officers learned that Jones had waived extradition. Custody of Jones was relinquished to the deputies, and they drove him back to Washington County, Mississippi. Sometime along the trip, Jones was again advised of his *Miranda* rights, and he again requested an attorney.

¶9. Officer David Sessums testified they were careful not to discuss the case with Jones during the trip from Memphis, because he had previously requested an attorney two times. Conversely, Jones testified the officers questioned him about the case and told him they could not help him unless he helped himself. Officer Sessums testified that Jones stated he wanted to tell them what happened, but did not know how to go about it. Officer Sessums further testified that Lieutenant Gaston told Jones he needed to be aware of his rights before telling them anything and then read Jones his *Miranda* rights again. Jones thereafter requested to speak with the District Attorney. Jones testified he made this request because the officers were questioning him about the case and offering him leniency for cooperation and he knew that any deal would have to be authorized by the District Attorney. As stated, the Officers testified that they did not question Jones.

¶10. Pursuant to Jones's request, District Attorney Frank Carlton, met with Jones for a brief time upon his arrival at the Washington County Sheriff's Office. A suppression hearing was held on February 16, 2000, regarding this conversation. Jones sought to suppress his statements on the grounds the statements obtained were not freely and voluntarily given but were a result of promises of leniency made by the District

5

Attorney during this brief meeting. Jones testified that he brought up manslaughter and the District Attorney responded, "I can charge you with manslaughter. I am the district attorney, I can charge you with public urination if I feel like it, as long as the detectives agree with the manslaughter - - recommend manslaughter, I'll do it." The District Attorney denied making this or any promise of leniency to Jones. He testified that no discussions about a plea ever occurred, and he made no promises of any kind to Jones. He testified that he shook Jones's left hand, inquired about his right hand, in terms of whether he had received medical attention, and then waited for Jones to say something. District Attorney Carlton testified that Jones said nothing, and so he took his leave.

¶11. After his conversation with the District Attorney, Jones, who previously had made no statement or confession, stated he wished to tell WCSO everything about the case. Officer Doyle Barrett testified that after the meeting with the District Attorney, Jones was completely and totally cooperative. Jones was again informed of his rights, waived them in writing, and then made the first of two statements. He confessed to planning Wilkerson's murder with Shamoun and then personally killing Wilkerson in Shamoun's presence. He confessed to cutting Wilkerson's throat inside the car, then following him into the field and stabbing him numerous other times. Jones alleged in his statement that all of his actions were done at the bidding of Shamoun, who Jones believed had ties to the mob, and that he was afraid Shamoun would kill him if he did not participate. He stated that after he cut Wilkerson in the car, Wilkerson exited the car and ran into the field. Shamoun told him "to finish him off." Jones did not want to, but Wilkerson told him to do so or he "would leave him there." Jones stated that he believed this to mean that Shamoun would kill him and leave him there. Deputy David Sessums of the WCSO testified that, in his opinion, Jones had no reason currently to fear Shamoun, but that he believed that Jones believed that he had reason to fear him.

6

¶12.     On January 13, after again waiving his rights in writing, Jones made another statement; adding the date Shamoun asked him to kill Wilkerson, the amount Shamoun was to pay him ($1,500 up front and another $2,000 after the investigation was over), and that Shamoun gave him money to buy the murder weapon (a filet knife purchased at Wal-Mart). Jones also gave audio and video statements, directed officers to the location of physical evidence used against him, and consented to having blood drawn for analysis. In addition, a letter to another inmate, in which Jones confessed to killing Wilkerson, was intercepted by the Arizona Department of Corrections and returned to WCSO. Jones testified that he only confessed and cooperated with the investigation because the District Attorney and WCSO gave him the impression that his charge would be reduced from murder to manslaughter if he cooperated. However, Jones also testified at the suppression hearing that the District Attorney never actually promised to give him manslaughter.

¶13.     Pursuant to information obtained from Jones, Shamoun was arrested on January 12, 1998. He was arraigned by Justice Court Judge DeVane on January 13, 1998. Jones was not arraigned until January 15, 1998, six days after his Memphis arrest. Officer Barrett acknowledged that Jones first requested an attorney on the morning of January 10, 1998; however, he was not given a lawyer until after the January 15 arraignment. As mentioned, from his arrest until his arraignment several incriminating statements were taken from Jones.

¶14.     Jones's Motion to Suppress the statements and confessions on the grounds that they were not voluntary and taken in violation of his Constitutional rights was denied. Jones's subsequent Motion for an Interlocutory Appeal was also denied. Jones's Motion for Disqualification of District Attorney Frank Carlton because he was a potential witness was also denied. At the close of the State's evidence, Jones's

7

Motion to Exclude the State's evidence and direct a verdict for Jones was denied. Jones also made a Motion to Disqualify Circuit Court Judge Ashley Hines. This motion was also denied.

¶15. The jury unanimously found Jones guilty of capital murder . A sentencing hearing was held, and the jury unanimously sentenced Jones to life imprisonment without parole. Jones's motion for judgment notwithstanding the verdict or, in the alternative, a new trial, was denied.

## DISCUSSION

### I. DID THE TRIAL COURT ERR IN HOLDING THAT JONES'S ARREST WAS SUPPORTED BY PROBABLE CAUSE?

¶16. In his first assignment of error, Jones argues that his initial arrest was illegal because it was not supported by probable cause. He insists that all evidence flowing from that illegal arrest must be suppressed. The State argues that the issue was not properly raised below and is not properly before this Court. Although he did not raise the issue of lack of probable cause to arrest in his pleadings, Jones brought the issue to the attention of the trial court. That court heard argument regarding it and addressed the claim in a post-trial order, setting out its reasons for denying the claim. Therefore, though he did not specifically raise the issue in his pleadings in the trial court, Jones objected on the issue at trial sufficient to raise it here. Moreover, "plain errors of sufficient constitutional importance are likely to affect the outcome of a case and may be addressed for the first time by this Court upon appeal." *Conerly v. State*, 760 So. 2d 737, 740 (Miss. 2000). "This Court has recognized an exception to procedural bars where a fundamental constitutional right is involved." *Maston v. State*, 750 So. 2d 1234, 1237 (Miss. 1999). *See also Smith v. State*, 477 So. 2d 191, 195 (Miss. 1985).

¶17. Jones claims he was placed under arrest at the Memphis bus station, that there was no arrest warrant at that time, and that there was insufficient probable cause to support a warrantless arrest. He

insists that all evidence gathered as a result of that illegal arrest should be suppressed as fruits of the poisonous tree. In this case, that would be all of the evidence used against Jones, including the confessions and the physical evidence Jones located for the WCSO. The initial question then becomes whether Jones placed under arrest by the Memphis police.

¶18. Detention of Jones by Memphis police was requested by WCSO so they could question him regarding the murder of Wilkerson. At this point, no arrest warrant for Jones had been issued. A person may be "detained" short of an actual arrest for investigatory purposes. *Estes v. State*, 533 So. 2d 437 (Miss. 1988); *Anderson v. State*, 368 So.2d 243 (Miss. 1979). However, any desire to merely detain Jones became an intention to make an arrest, given the fact that WCSO immediately secured an arrest warrant when they learned Jones had been detained in Memphis. Furthermore, the limited exception to the warrant and probable cause requirements carved out in *Anderson* and *Estes* applies only to "brief" detentions. Jones's detention in Memphis necessarily required those authorities to hold him for several hours until the WCSO could arrive from Mississippi to question him, thereby exceeding the "brief" detention contemplated by *Anderson* and *Estes*.

¶19. An arrest occurs when a person is subjected to "actual or constructive seizure or detention of [his person], or his voluntary submission to custody, the restraint being under real or pretended legal authority." *Bearden v. State*, 662 So.2d 620, 623 (Miss. 1995). Since Jones was detained by authorities in Memphis, taken to police headquarters there, and held for some four hours until WCSO could arrive, and given the fact that an arrest warrant was secured at the request of Memphis officers to sustain the detention, Jones was placed under arrest at the bus station and was not merely subjected to a non-custodial, investigatory detention.

9

¶20. "To effect arrest for a felony, either with or without a warrant, a police officer must have reasonable cause to believe a felony has been committed, and reasonable cause to believe that the person proposed to be arrested is the one who committed it. *Caldwell v. State*, 443 So. 2d 806, 811 (Miss. 1983), *citing* *Powe v. State*, 235 So. 2d 920 (Miss. 1970). At the time of Jones's arrest, neither Memphis police nor WCSO possessed a warrant for his arrest. Jones argues that his arrest was illegal because he was arrested without a warrant and that the warrant that was later secured at the request of the Memphis officers was invalid because it was not supported by probable cause. However, it is settled law in Mississippi that a person may be arrested, without a warrant, if the officer has reasonable grounds to believe that a felony has been committed by the person to be arrested. Miss. Code Ann. § 99-3-7 (Rev. 2000); *Alexander v. State*, 503 So.2d 235 (Miss. 1987).

¶21. "Probable cause is a practical, non-technical concept, based upon the conventional considerations of every day life on which reasonable and prudent men, not legal technicians, act. It arises when the facts and circumstances within an officer's knowledge, or of which he has reasonably trustworthy information, are sufficient to justify a man of average caution in the belief that a crime has been committed and that a particular individual committed it." *E.g., Conerly v. State*, 760 So.2d 737, 740 (Miss. 2000). This determination is to be made from the "totality of the circumstances." *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *Sims v. State*, 512 So.2d 1256 (Miss. 1987).

¶22. WCSO had sufficient probable cause to believe that Jones had been involved in the murder of Wilkerson. Jones lived with and worked for Wilkerson. He had made plans days before the murder to leave the State on the day of the murder. He did in fact leave the State just hours after the murder. WCSO reasonably suspected from their investigation that two people had been involved in Wilkerson's murder, and Shamoun, who admitted driving Jones to the bus station, gave several different versions of his

10

interaction with Jones on the day of the murder and made a statement strongly suggesting that he had been involved in some way with Wilkerson's death. The investigation also suggested that the person who killed Wilkerson injured his right hand during the commission of the murder, and Memphis police confirmed that Jones did in fact have an injured hand when arrested at the bus station.

¶23. The "duty of a reviewing court is simply to ensure that ... a 'substantial basis for concluding' that probable cause existed" was evidenced. *Rooks v. State*, 529 So. 2d 546, 554 (Miss. 1988) (quoting *Illinois v. Gates*, 462 U.S. at 238-39, 103 S.Ct. at 2332, 76 L.Ed. 2d at 548). The trial court had a substantial basis for finding that probable cause existed, and its decision to that effect was not clearly erroneous and will not be disturbed here.

¶24. Jones argues that whether WCSO possessed sufficient probable cause is irrelevant as it was Memphis police who arrested him, not WCSO. He contends that because Memphis police had no personal knowledge of his participation in the crime, they possessed no probable cause to arrest him. However, the Memphis police could reasonably rely on information relayed to them by WCSO in making the arrest of Jones. The reasonable belief of WCSO of Jones's involvement in the murder could be transferred to Memphis police. In *Williams v. Lee County Sheriff's Department*, 744 So. 2d 286 (Miss. 1999), this Court held that officers in Mississippi were entitled to rely on information they received from California law enforcement authorities who informed them that a murder had been committed in California and that a person with the defendant's social security number and physical characteristics had committed it.[3] *See also Hamburg v. State*, 248 So. 2d 430, 432 (Miss. 1971) (information provided

[3]In **Williams**, a 42 U.S.C. § 1983 civil case, the information-providing officers did already possess an arrest warrant when they requested assistance from Mississippi officers. However, this Court appeared to hold that the information regarding the defendant's participation in the crime was sufficient probable cause for an arrest, irrespective of the arrest warrant.

11

to arresting officer by law enforcement source provided sufficient probable cause to make an arrest); *Parks v. State*, 180 Miss. 763, 178 So. 473 (1938) (where information of a crime provided by sheriff of one county to sheriff of another county held sufficient probable cause to justify warrantless arrest by the former). An officer's reliance on computer reports, radio communications, and dispatcher information have been held to confer sufficient probable cause for arrest. *See Mitchell v. State*, 792 So. 2d 192 (Miss. 2001) (radio communication); *Jones v. State*, 481 So. 2d 798 (Miss. 1985) (radio); *Hodge v. State*, 801 So. 2d 762 (Miss. Ct. App. 2001) (computer report); *Jones v. State*, 799 So.2d 171 (Miss. Ct. App. 2001) (dispatcher). Moreover, it is settled law in Mississippi that an informant may provide officers with sufficient probable cause to make a warrantless arrest. *See Abram v. State*, 606 So. 2d 1015 (Miss. 1992); *Moore v. State*, 493 So. 2d 1295 (Miss. 1986), *Jones v. State*, 358 So. 2d 414 (Miss. 1978). There is no reason why information received from another law enforcement official, who has a sworn duty to uphold the law, should be any less reliable than information received from an informant who's credibility, in many situations, is uncertain.

¶25. In short, Jones's arrest in Memphis was supported by probable cause. Therefore, even without a warrant, it was a legal arrest. Jones's confession should not be suppressed on the grounds of an illegal arrest.

¶26. The first assignment of error is without merit.

## II. DID LAW ENFORCEMENT OFFICERS OF WASHINGTON COUNTY, MISSISSIPPI IMPROPERLY QUESTION JONES AFTER HE HAD REQUESTED AN ATTORNEY?

¶27. In his second assignment of error, Jones alleges that he was questioned by Washington County deputies after he had invoked his constitutional right to counsel. Jones contends this questioning occurred in Memphis during the initial interview with Washington County officers and then again during the drive from

12

Memphis to Washington County. Questioning of a person who is in custody of law enforcement must cease if he invokes his privilege against self-incrimination or his right to counsel. ***Riddle v. State***, 580 So. 2d 1195, 1199 (Miss. 1991).

¶28.    Jones invoked his right to counsel during the initial interview and questioning ceased. Although questions were asked regarding Jones's injured hand, these questions were necessary to determine whether medical treatment was needed, a duty being laid upon the prison's jailer to provide for such care. *See, e.g.,* ***Leach v. Shelby County Sheriff,*** 891 F.2d 1241 (6th Cir. 1989) (Tennessee authorities have affirmative duty to know of medical needs of inmates and act upon them).[4] The only questions asked of Jones were whether he had injured himself and, if so, how. These questions were necessary and proper to ask and they were not necessarily questions about Jones's involvement in Wilkerson's murder. Law enforcement officials do not run afoul of ***Miranda*** where they put questions to such a person in order to determine whether medical assistance is necessary. Moreover, the answer given by Jones (that he had injured his hand at work) was not an incriminating statement, nor was it a confession. Thus, any potential violation of ***Miranda*** would be harmless. ***Peterson v. State***, 540 So.2d 1340 (Miss. 1989). Jones's confession occurred several days later, after he initiated contact and stated that he wished to make a statement. It cannot be said that Jones's statement about his injury had any effect upon the verdict. Therefore, Jones's argument that his constitutional right to be free from questioning once he had requested an attorney was violated when officers inquired about the injury to his hand is without merit.

_____

[4]Mississippi law imposes a similar duty upon its own law enforcement officers. *See* Miss. Code Ann. § 47-1-57 (Rev. 2000) (When any person confined in jail shall be in need of medical or surgical aid, the sheriff shall immediately examine the condition of such prisoner and, if he is of the opinion that the prisoner needs such aid, he shall call in a nurse or physician to attend him).

¶29.    Jones further argues that his rights were violated by the officers photographing his hand. *Miranda* applies to custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694 (1966). It does not prohibit an officer from testifying as to his observations of the appearance or condition of a person in custody. Furthermore, photographing Jones's injury, a matter clearly within the plain view of the officers and incident to a lawful arrest would not be an improper search either. Jones had no more of a reasonable expectation of privacy with respect to his hand than he would have had with his handwriting. *See* ***Burns v. State***, 729 So. 2d 203 (Miss. 1998). Moreover, since there was a duty on the part of the Memphis officials to know and act upon a medical need of a person in their custody, the nature of the injury to Jones's hand would have been inevitably discovered when they discharged that duty. Jones did in fact receive medical attention for the injury to his hand; therefore, the existence and degree of that injury would have become known to WCSO regardless of the questions asked of Jones by them after he requested an attorney. *See* ***Nix v. Williams***, 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) (holding that evidence seized in an unreasonable search may, nevertheless, be admitted if it can be demonstrated that the evidence would, in all likelihood, ultimately have been discovered by constitutionally means).

¶30.    Jones also claims that the deputies questioned him about the murder and offered him assistance in return for his cooperation during the drive to Washington County. WCSO deputies testified they did not question Jones or make any promises to him. No confession or information was gathered during the trip from Memphis to Washington County. Therefore, keeping in mind that the trial court found Jones's accusations not to be credible, even if the officers had questioned Jones, this violation of his rights was harmless.

14

¶31. It is uncontested that Jones was given a *Miranda* warning during the drive and that he requested a conference with the District Attorney. This was arranged, and Jones subsequently confessed. While it is true that questioning of an accused who is in custody must cease at the point he invokes his privilege against self-incrimination or his right to counsel, it is equally true that any such invocation by him does not prohibit him from later initiating contact and discussing the crime of which he is accused. *Hunter v. State*, 684 So. 2d 625 (Miss. 1996). Jones requested the conference with the District Attorney. He also initiated the conversations with officers after that meeting during which time he confessed.

¶32. The officers testified that Jones initiated a conversation about the crime. Jones says the deputies did. The circuit court found the testimony in favor of admission of the confession the Jones ultimately gave, and it issued a detailed, written finding of fact and conclusion of law, applying the legal analyses applicable to the Jones's claim, and specifically stating why it did not find the Jones's testimony worthy of belief. Because the trial court's finding was based on substantial evidence and cannot be said to be "clearly erroneous," it is affirmed here. *Dancer v. State*, 721 So. 2d 583 (Miss. 1998).

¶33. Jones's second assignment of error is without merit.

### III. WHETHER THE DISTRICT ATTORNEY ACTED IMPROPERLY BY MEETING WITH JONES, AT JONES'S REQUEST, BEFORE COUNSEL WAS PROVIDED TO HIM.

¶34. In his third assignment of error, Jones alleges that the District Attorney deprived him of his right to counsel by agreeing to meet with Jones before he was represented by counsel. Jones argues that his conviction should be reversed because the District Attorney promised him lenity. At trial, Jones moved to disqualify District Attorney Frank Carlton, arguing disqualification was proper based on: his appearance at the jail to talk with Jones before he had been formally charged, the potential that Carlton would be called

15

as a witness in the case, and the difficulty if not the impossibility for the District Attorney's office to be objective and fair-minded in its exercise of prosecutorial discretion. The motion was denied.

¶35. Jones cites numerous Mississippi cases where this Court has "repeatedly condemned the practice whereby law enforcement interrogators, or related third parties, convey to suspects the impression, however slight, that cooperation by the suspect might be of some benefit." *Abram v. State*, 606 So.2d 1015, 1031 (Miss. 1992); *Dunn v. State*, 547 So.2d 42 (Miss. 1989); *Miller v. State*, 243 So.2d 558, 559 (Miss. 1971); *Agee v. State*, 185 So.2d 671, 674 (Miss. 1966); *Johnson v. State*, 89 Miss. 773, 777, 42 So. 606 (1907); *Mitchell v. State*, 24 So. 312 (Miss. 1898). "Long before *Miranda* warnings were mandated by the U.S. Supreme Court, it was well settled in Mississippi jurisprudence that a confession given after promises of leniency was incompetent as evidence." *Dunn v. State*, 547 So. 2d 42, 44 (Miss. 1989). In *Mitchell v. State*, this Court held that a confession given by a defendant was not voluntarily made subsequent to his being told by the sheriff that it would be "best for him to tell all about it." *Mitchell,* 24 So. at 312 (Miss. 1898). In *Matthews v. State*, 102 Miss. 549, 59 So. 842 (1912), a black defendant fourteen years of age accused of stealing an item of jewelry had been told by the town marshal that it would be better for him to get the pin, if he would tell the truth, "it would be all right," and "I don't want to put you in any trouble." This Court held that the subsequent confession was not voluntary. In *Robinson v. State*, 247 Miss. 609, 157 So. 2d 49, 51 (1963), this Court stated:

> The question before the Court is whether there was a promise or an inducement offered to defendant if he confessed. The test in such cases is whether the inducement is of a nature calculated under the circumstances to induce a confession irrespective of its truth or falsity; a mere exhortation or adjuration to speak the truth will not exclude a confession, but where such adjuration is accomplished by an expression that it would be better for the accused to tell the truth, some courts have refused to admit such confession.

16

¶36. However, in each of the cases cited by Jones wherein a confession was rendered inadmissible due to promises of leniency, it was uncontradicted that the statement was made. In the case at bar, Jones and the authorities' recollection of the events leading up to his confession was in dispute, and was decided in favor of the authorities' version by the trial court after an extensive hearing.

¶37. Jones also relies upon *Adams v. State*, 202 Miss. 68, 30 So.2d 593 (1947), wherein this Court found that, because of the prosecution's misconduct in the investigation of the case, the evidence obtained was inadmissible and despite the obvious guilt of the defendant that the Court had to reverse the trial court's decision and discharge the appellant. However, *Adams* is distinguishable from the case at bar. In *Adams*, the district attorney secured a search warrant, traveled with the sheriff to the place to be searched, and engaged in a search of the premises without presenting the warrant of otherwise informing the accused of their purpose. At trial, the district attorney testified against the accused. This Court reversed the conviction, holding that the district attorney, "by his over-zealous conduct, violated prejudicially his duty to be fair and impartial." 202 Miss. at 598. In the case at bar, District Attorney Frank Carlton's brief visit with Jones, at Jones's request, can hardly be said to have risen to the same level of misconduct condemned in *Adams*.

¶38. In Mississippi, if the defendant offers testimony that a confession was involuntary due to promises, the State must offer in rebuttal the testimony of all the officers who were present when the alleged promise or threat was posed or give an adequate reason for the absence of such witnesses. This is referred to as the *Agee* Rule. *Agee v. State*, 185 So.2d 671 (Miss. 1966). *See also Mettetal v. State*, 602 So.2d 864 (Miss. 1992). Non-compliance with the rule will cause reversal. *Powell v. State*, 483 So.2d 363 (Miss. 1986). The State has the burden of proving voluntariness of the confession and it must be proved

17

beyond a reasonable doubt. ***Mettetal v. State***, 602 So.2d 864 (Miss. 1992); ***Neal v. State***, 451 So.2d 743 (Miss. 1984). This burden is met by the testimony of an officer, or other person having knowledge of the facts, that the confession was voluntarily made without any threats, coercion, or offer of reward. This makes out a prima facie case for the State on the question of voluntariness. ***Lee v. State***, 236 Miss. 716, 112 So. 2d 254 (1959). We have held that "the resolution of conflicting testimony regarding voluntariness is a question of fact to be resolved by the trial judge at the suppression hearing." ***Chase v. State***, 645 So.2d 829, 841 (Miss.1994) (quoting ***Smith v. State***, 465 So.2d 999, 1002 (Miss.1985)). When determining voluntariness, the court must look at the "totality of the circumstances" surrounding the statement.

¶39. In the case at bar, a suppression hearing was conducted. At the hearing the District Attorney as well as all officers present during the conversation testified. They all confirmed the District Attorney's testimony that he made no promises of lenity to Jones. After a careful review of the record, the only evidence we have found supporting his accusation that he was promised manslaughter is Jones's own testimony and the fact that immediately following this conversation he confessed. Jones's immediate confession after consistently refusing to give a statement for several days does tend to support Jones's testimony that he did so based on promises of lenity. However, beyond Jones's testimony, the record is absent proof that his decision to do so was prompted by anything the District Attorney or WCSO said or indicated to him. Moreover, Jones also testified that the District Attorney never actually promised to charge him with manslaughter.

¶40. Jones cites as further evidence of coercion the fact that deputies called his mother and claimed they were trying to help Jones and that it would be better for him to cooperate with them. However, she did not speak to Jones until after he had given his confessions and shown the deputies where the various items

18

of physical evidence were located. No statements made by the deputies to Jones's mother could have acted as promises of lenity or as improper inducements to Jones, he having never been aware of them prior to the time he made his confession. Jones even told her when they did speak that he confessed because it was the right thing to do.

¶41. The District Attorney testified that he made no promises to Jones. Officer Sessums was also present during this meeting and testified that District Attorney Carlton told Jones "the best advice he could give him . . . that he was not in a position to tell him what was going to happen or to offer him any deals or anything else, the only thing he could tell him that was in - - that in his position, the best thing to do was always to tell the truth." In this Court's opinion, the District Attorney's statement does not rise to the level of inducement found in the cases cited by Jones. If anything, it was a "mere exhortation or adjuration to speak the truth" of the type described in *Robinson* as being insufficient to render a confession involuntary.

¶42. Furthermore, in *Stokes v. State*, 548 So.2d 118, 122 (Miss. 1989), this Court held that when the circuit court expressly or implicitly resolves the issue of admissibility of a confession against a defendant, our scope of review is confined to the established limits. In *Alexander v. State*, 610 So.2d 320 (Miss. 1992) (internal citations omitted), this Court set out the standard of review on voluntariness of confessions, finding it is essentially a fact-finding function. So long as the court applies the correct legal standards, "we will not overturn a finding of fact made by a trial judge unless it be clearly erroneous." Where, on conflicting evidence, the court makes such findings this Court generally must affirm. *Id.* at 326. *See also Veal v. State*, 585 So.2d 693, 697 (Miss. 1991) (this Court will not reverse trial court on conflicting testimony as to whether coercion used to obtain confession). The Circuit Court found that no offers of lenity or plea

19

discussions took place, and that Jones's confessions were voluntary. Since this finding is based upon substantial evidence and is not clearly erroneous, it must be affirmed here.

¶43. Jones's third assertion of error is without merit.

**IV. WAS THE WCSO'S FAILURE TO PROVIDE JONES WITH AN INITIAL APPEARANCE WITHIN 48 HOURS PREJUDICIAL TO HIM?**

¶44. Jones cites as his fourth assertion of error the failure of WCSO to provide him with an initial appearance within 48 hours, as required by Rule 6.03 of the Uniform Circuit and County Court Rules. Rule 6.03 provides, "Every person in custody shall be taken, without unnecessary delay and within 48 hours of arrest before a judicial officer or other person authorized by statute for an initial appearance."

¶45. Jones was arrested in Memphis on January 10, was returned to Mississippi on January 12 at approximately four o'clock p.m., and was given an initial appearance in Mississippi on January 15, 1998; a period clearly exceeding the period mandated by Rule 6.03. Upon his return to Mississippi on the 12th, Jones confessed to the murder. Between this confession and his initial appearance on the 15th, Jones made other incriminating statements and led police to substantial physical evidence used against him.

¶46. Jones cites *Abram v. State*, 606 So. 2d 1015 (Miss. 1992), where this Court found reversible error in part due to failure to provide an initial appearance according to Rule 6.03 (then Rule 1.04). In *Abram*, the confession in question was found to be coerced, and this Court found the confession to have devastating consequences for the defense because the State would not have obtained an uncounseled confession if the accused had been provided a timely initial appearance and access to counsel. Under these circumstances, where the defendant's conviction relied solely upon his confession, this Court held it to be reversible error for the State to fail to provide an initial appearance where a judge was available at all times. *Abram*, 606 So. 2d at 1029. In the case at bar, the confession provided by Jones prior to his initial

20

appearance was the substance of the State's case against him.  Moreover, he provided information that led to the arrest of Shamoun on January 12, 1998, who was given a timely initial appearance by Judge DeVane on January 13, 1998.  WCSO Officer Barrett acknowledged that in addition to Judge DeVane's availability on January 12th, 13th, 14th, other magistrates were available.

¶47.    It is well established that the failure to provide an initial appearance for an accused within the time provided is not, of itself, a reason to suppress a confession.  *Davis v. State*, 743 So. 2d 326, 337 (Miss. 1999).  In *Morgan v. State*, 681 So.2d 82 (Miss. 1996) and *Veal v. State*, 585 So. 2d 693 (Miss. 1991), this Court found that a violation of Rule 6.03 alone will not result in the suppression of evidence or reversible error where the defendant was informed of his rights and made a knowing and voluntary waiver. *But see Gordon v. State*, 160 So. 2d 73 (Miss. 1964); *Parker v. State*, 244 Miss. 332, 141 So. 2d 546 (1962) (holding that considerable delay in providing an initial appearance alone can be reversible error).

¶48.    In *Veal*, this Court was confronted with a situation similar to the case at bar.  Veal, like Jones, had been arrested by warrant before he confessed.  Veal, like Jones, was informed of his Miranda rights and he waived those rights.  Veal, like Jones, argued on appeal that the lower court erred in refusing to suppress his confession because the State had unnecessarily delayed his initial appearance to gain a confession.  On appeal, this Court rejected Veal's argument and held that he had been promptly advised of his attached right to counsel, and he clearly and promptly waived that right.  Accordingly, no error was found in the use of Veal's post-initial appearance confession.  *See also Ormond v. State*, 599 So.2d 951, 955 (Miss. 1992) (delay in initial appearance "cannot constitute per se reversible error, even when a defendant gives evidence prior to the delayed appearance).

21

¶49.     Jones waived extradition to Mississippi at some point between his arrest in Memphis on January 10 and his return to Washington County, Mississippi, on January 12, 1998.  The State argues that this was sufficient to comply with the spirit of Rule 6.03, because there would have been a hearing in Memphis to determine if Jones would waive extradition to Mississippi and this hearing would have necessarily included a determination of probable cause to hold him.  However, there is no evidence in the record confirming that any such determination was made at the hearing in Memphis, or that a hearing of any kind was conducted.  Moreover, Rule 6.03 lists several rights of which a magistrate must inform a person brought before him/her in an initial appearance.[5]   Assuming, arguendo, that an extradition hearing was conducted in Memphis, there is no evidence that any of these rights were communicated to Jones at the Memphis extradition hearing.

¶50.     Additionally, the State argues that it is determinative on this issue that Jones was arrested pursuant to a valid arrest warrant.  The main purpose of the initial appearance, they argue, is to determine probable cause for arrests made without a warrant, thus when an arrest is made pursuant to an arrest warrant there is no requirement for an initial appearance, as the determination of probable cause has already been made.  However, this argument fails as it does not consider that Jones was initially arrested without a warrant, and it overlooks the other purposes of Rule 6.03.

¶51.     Jones gave a written confession on January 12 at 6:27 p.m., shortly after returning to Mississippi.  In this confession he described his and Shamoun's plan to murder Wilkerson. He told the officers the details

---

[5]In addition to determining probable cause for arrest, the judicial officer must advise the defendant of the following: (1) that the defendant is not required to speak and that any statements made may be used against him/her; (2) of the right to counsel and the right to have counsel appointed if the defendant cannot afford one; (3) that the defendant has the right to communicate with an attorney and family or friends and that reasonable means will be provided to enable the defendant to do so; (4) any conditions under which the defendant may obtain release; (5) that the defendant has the right to demand a preliminary hearing while the defendant remains in custody.

of how they carried out the murder, where he discarded the murder weapon, the hotel where he and Shamoun washed the blood off of themselves and threw away their clothes, and the location where he and Shamoun sank Wilkerson's car. In short, Jones provided WCSO with sufficient evidence to charge him with the murder of Wilkerson and for them to independently locate all the remaining evidence that Jones subsequently led them to. Though this confession was made more than 48 hours after Jones was arrested in Memphis, it was immediately after he was returned to Mississippi.

¶52. In *County of Riverside v. McLaughlin*, 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991), the United States Supreme Court examined what is reasonable delay before determining whether there was probable cause for a warrantless arrest. The Court acknowledged that practical realities would sometimes result in delays, such as: transporting a prisoner from one facility to another, handling late-night bookings where no magistrate is readily available, and obtaining the presence of the arresting officer. Such delays are reasonable under the Fourth Amendment. *Id.* at 57, 111 S.Ct. at 1670.

¶53. The WCSO should not be punished for failing to provide Jones an initial appearance while he was under the custody of Memphis police. The practical reality of waiting for Jones to waive extradition and then transporting him back to Mississippi naturally caused a delay in providing an initial appearance. The 48 hour period should have begun at the point when Jones was under the control of the WCSO. Applying this reasoning, Jones's initial appearance would have been required no later than four o'clock p.m. on January 14, 48 hours after being taken into custody by WCSO. The statement given by Jones on January 12 was completely incriminating, sufficient to prosecute him for Wilkerson's murder, and well within the 48 hour period. Therefore, the delay in providing Jones an initial appearance caused him no prejudice. A timely initial appearance in Mississippi might have resulted in less evidence being gathered, but it would

23

not have resulted in suppression of the evidence against Jones to the extent where there is any reasonable probability that the verdict would have changed.

¶54. Moreover, exclusion of Jones's confession on this ground will not further the deterrent purpose of the exclusionary rule because WCSO has no control over what occurred in Memphis. Holding them responsible for the failure of Memphis authorities to provide criminal defendants timely initial appearances will not, in this Court's opinion, increase Memphis authorities' compliance with Mississippi law.

¶55. The trial judge found that Jones's confessions were admissible because Jones had been advised of his right to counsel and that he knowingly, intelligently and voluntarily waived this right. As this decision does not appear to be manifestly wrong, it will be upheld here on appeal.

¶56. This issue is without merit.

## V. WHETHER THE TRIAL JUDGE ERRED BY NOT RECUSING HIMSELF.

¶57. On motion by Jones for disclosure of any possible basis for judicial recusal, the judge stated that his former law firm had represented Jones's co-defendant's father in the early 1980s, in a matter concerning the Board of Levee Commissioners; that his former law firm had represented an individual in a dispute with Shamoun; and that the Assistant District Attorney who tried the case practiced law with the judge for several years.

¶58. This disclosure prompted a motion for recusal by the defense, in which these facts were alleged as reasons for recusal. In addition, Jones claimed that the action of the trial judge in denying relief upon certain defense motions and objections evinced bias against him.[6] The trial court denied relief on this

---

[6]The judge's actions that Jones alleges illustrate bias include: denying the Defendant's Suppression Motions; denying the Defendant's Motion to Disqualify the District Attorney; denying the Defendant's Motion to Continue for purposes of obtaining an expert psychological evaluation to be

motion to recuse, finding that "a reasonable person, knowing all of the circumstances, would not harbor any doubts as to the impartiality" of the judge.

¶59.    Jones alleges the trial judge erred by refusing to recuse himself.  He cites Canon 3 of the Code of Judicial Conduct wherein it is stated that the judge's duty is not to give any appearance of partiality.  He alleges the judge's actions at trial indicate that the judge was biased against him.  The State argues that mere claims of error should not be elevated to a charge of judicial misconduct.  They argue that this Court should consider that even if a trial judge's rulings are erroneous, they do not for that fact demonstrate bias.

¶60.    This Court applies an objective standard in deciding whether a judge should have disqualified himself.  Miss. Code of Jud. Conduct Canon 3.  "A judge is required to disqualify himself if a reasonable person, knowing all the circumstances, would harbor doubts about his impartiality." *Jenkins v. Forrest County Gen. Hosp.*, 542 So. 2d 1180, 1181 (Miss. 1988).  Article 6, § 165 of the Mississippi Constitution (1890) provides in part: "No judge of any court shall preside on the trial of any cause, where the parties or either of them, shall be connected with him by affinity or consanguinity, or where he may be interested in the same, except by the consent of the judge and of the parties."   "The decision to recuse or not to recuse is one left to the sound discretion of the trial judge, so long as he applies the correct legal standards and is consistent in the application." *Collins v. Joshi*, 611 So. 2d 898, 902 (Miss. 1992).  On appeal, a trial judge is presumed to be qualified and unbiased and this presumption may only be overcome

---

used in sentencing; and denying Defendant's Motion to Continue so Defendant's DNA expert could evaluate the State's DNA results because the State failed to timely disclose said results.  Jones also seeks to demonstrate bias by arguing the judge made a derogatory comment about the defense at trial; presided over the initial appearance and the trial, even though Jones subpoenaed him as a possible trial witness; refused to certify an interlocutory appeal; and allowed Dr. Steven Hayne to testify after the State conceded that the Defense's objection to his testimony may be correct (the trial judge had his law clerk research the point before allowing Dr. Hayne to testify).

by evidence which produces a reasonable doubt about the validity of the presumption. ***Bredemeier v. Jackson***, 689 So. 2d 770, 774 (Miss. 1997). When a judge is not disqualified under the constitutional or statutory provisions the decision is left up to each individual judge and is subject to review only in a case of manifest abuse of discretion. ***Buchanan v. Buchanan***, 587 So. 2d 892, 895 (Miss. 1991). In determining whether a judge should have recused himself, the reviewing court must consider the trial as a whole and examine every ruling to determine if those rulings were prejudicial to the complaining party. ***Hunter v. State***, 684 So.2d 625, 630-31 (Miss.1996).

¶61. Jones first claims that Judge Hines's former law firm's representation of his co-defendant's father and their handling of a matter adverse to the same illustrates that Judge Hines should have recused himself. Apparently, some twenty years prior to trial, Judge Hines's former law firm represented Joe Shamoun in a matter having no relation to this case. That firm also handled a matter adverse to Joe Shamoun, also around twenty years prior to trial. Nothing in the record illustrates that Judge Hines should have recused himself based on these coincidences.

¶62. Next, Jones argues as grounds for recusal the fact that Judge Hines formerly practiced law with Assistant District Attorney Tucker Gore for approximately four years ending in February, 1993. Gore was the State's lead attorney in the case. This Court presumes that a judge, sworn to administer impartial justice, is qualified and unbiased. To overcome the presumption, the evidence must produce a reasonable doubt about the validity of the presumption. ***Turner v. State***, 573 So. 2d 657, 658 (Miss. 1990). As the following discussion illustrates, Jones failed to offer any evidence that Judge Hines was biased in any way. His decisions were sound and his judgment fair.

¶63. Accordingly, absent some showing of actual prejudice or bias, there was no error in Judge Hines presiding at Jones's trial. Initially, it should be noted that the majority of Jones's allegations of bias revolve

around Judge Hines's denial of trial motions. This Court held in *Farmer v. State*, 770 So.2d 953, 958 (Miss. 2000), that "[j]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion." However, because of the severity of the charges against Jones and the sentence imposed on him, each of his allegations have been considered and will be addressed in turn.

*(1) Denying the Defendant's Motion to Disqualify the District Attorney.*

¶64. This substance of Jones's objection to the District Attorney's participation in the trial was addressed in Section III *supra* and will not be discussed at great length again here. Jones sought disqualification of District Attorney Carlton on the grounds that he was a potential witness in the trial because of his pre-confession conversation with Jones. Judge Hines overruled this motion on the grounds that he had already found that the District Attorney made no such promises to Jones. He further held that, in the event the District Attorney is called to testify on that collateral matter,[7] he saw no basis to disqualify him on this ground. This ruling was based on sound reasoning and is insufficient to overcome the presumption that Judge Hines was not biased against Jones.

*(2) Denying the Defendant's Motion to Continue for purposes of obtaining an investigator and an expert psychological evaluation to be used in sentencing.*

¶65. Next, Jones asserts as evidence of bias Judge Hines's denial of a motion for continuance for the purpose of securing an investigator in West Virginia and a mental health professional to evaluate Jones and prepare to testify at the sentencing phase. Judge Hines based his denial of this motion on the fact that Jones was arraigned in July of 1998 and did not attempt to get an investigator or a mental health evaluation until two weeks prior to trial in April of 2000. Judge Hines also based the denial on the fact that there had

---

[7]District Attorney Carlton did in fact testify regarding this conversation at the suppression hearing.

already been seven continuances in the matter, five of which were chargeable to the defendant. Judge Hines's denial of this motion was within his discretion and evidences no bias against Jones. Moreover, as Jones was sentenced to the least severe penalty he could receive, life imprisonment without the possibility of parole, the denial of a continuance did not prejudice Jones.

> *(3) Denying Defendant's Motion to Continue so Defendant's DNA expert could evaluate the State's DNA results.*

¶66. Next, Jones argues that bias against him was demonstrated by Judge Hines's refusal to grant a continuance so that the defense's DNA expert could evaluate the State's DNA evidence. This evidence was not provided to the defense until the week before trial. Judge Hines denied this motion on the grounds that the DNA evidence would not be presented until several days into the trial and Jones would not be prejudiced because his expert could review it in the interim. This was within the judge's discretion and evidences no bias against the defendant. Moreover, as the trial court ruled that the State's DNA evidence was cumulative and therefore inadmissible, the denial of a continuance did not prejudice Jones.

> *(4) Judge Hines's alleged derogatory comment about the defense at trial.*

¶67. Jones alleges that Judge Hines commented that it was ineffective assistance of counsel not to have requested a continuance before the day of trial. Jones offers no documentation from the record to support this allegation. "Our law is clear that an appellant must present to us a record sufficient to show the occurrence of the error he asserts and also that the matter was properly presented to the trial court and timely preserved." ***Acker v. State***, 797 So. 2d 966, 972 (Miss. 2001) (quoting ***Lambert v. State***, 574 So. 2d 573, 577 (Miss. 1990)). *See also* ***Pulphus v. State***, 782 So. 2d 1220, 1224 (Miss. 2001) ("Issues cannot be decided based on assertions from the briefs alone. The issues must be supported and proved by the record.") (citing ***Robinson,*** 662 So. 2d 1100, 1104 (Miss. 1995). If the defense believed

28

the judge made a derogatory comment about it, it was incumbent upon the defense to make a record of the matter. Having failed to do so at the trial level, Jones cannot assert it for the first time here on appeal.

*(5) Refusal to grant an interlocutory appeal.*

¶68. After the trial court declined to suppress the confessions, Jones requested a continuance to pursue an interlocutory appeal. This request was denied. He now argues that denial was error. The decision to grant or deny a continuance is left to the sound discretion of the trial court. ***Johnson v. State***, 631 So. 2d 185, 189 (Miss. 1994). Reversal is authorized when the judge abuses this discretion, and this abuse results in an injustice. However, unless that discretion has been abused, this Court will not reverse the trial court's decision. ***Id.*** Evidentiary rulings are within the broad discretion of the trial court and will not be reversed absent an abuse of discretion. ***Coleman v. State***, 697 So.2d 777, 784 (Miss.1997). Rule 5 of the Mississippi Rules of Appellate Procedure specifically provides for, and governs, interlocutory appeals:

> (a) Petition for Permission to Appeal. An appeal from an interlocutory order may be sought if the order grants or denies certification by the trial court that a substantial basis exists for a difference of opinion on a question of law as to which appellate resolution may:
> (1) Materially advance the termination of the litigation and avoid exceptional expense to the parties; or
> (2) Protect a party from substantial and irreparable injury; or
> (3) Resolve an issue of general importance in the administration of justice.

¶69. Bearing in mind the presumption that Judge Hines is qualified and unbiased unless and until Jones produces evidence which creates a reasonable doubt about the validity of this presumption, this Court finds this assertion of bias lacking merit. Judge Hines had sufficient evidence before him that tended to indicate that Jones's confessions were freely and voluntarily given. Jones was given ***Miranda*** warnings numerous times before his confession, and he waived them in writing. Though he alleges that he only did so because

he believed he would be charged with manslaughter, Jones testified that the District Attorney never promised to so charge him. Judge Hines conducted a hearing wherein all the officers present at the meeting testified that the District Attorney offered no deal to Jones. Jones's mother testified that he told her he confessed because "he had to be at peace with himself, he was going to cooperate, it was the right thing to do." Judge Hines did not abuse his discretion in failing to grant an interlocutory appeal to Jones.

### (6) Refusal to recuse himself.

¶70.    Jones also asserts as evidence of bias Judge Hines's refusal to recuse himself after Jones subpoenaed him as a possible witness for having conducted Jones's initial appearance. Jones asserts that Judge Hines should have recused himself because "there were facts arising out of that initial appearance and the warrants issued by him which might cause him to be called as a witness." Jones offers no further support for this allegation of bias. He does not describe what facts from the initial appearance might cause the judge to be a necessary witness, nor does he describe what warrants he is referring to. Therefore, this Court is not under any obligation to review this issue. *See **Zimmerman v. Three Rivers Planning & Dev. Dist.***, 747 So. 2d 853, 861 (Miss. 1999) ("[T]he issue is precluded from review by this Court because of Zimmerman's complete failure to present any citation of authority or meaningful argument. . ..")

¶71.    In this Court's opinion, Jones's bare assertion that Judge Hines's should have recused himself simply because he presided over his initial appearance lacks common sense as well as authority. If Judge Hines became a potential witness merely by presiding over Jones's initial appearance, why then would he not be a witness for presiding over the suppression hearing or the other motions filed by Jones? In any

event, because his argument is merely a bare assertion, unsupported by authority in law or in the record, this assignment of bias is not a proper subject of review by this Court.

### *(7) Permitting Dr. Steven Hayne to testify during sentencing.*

¶72.   In his final allegation of bias, Jones complains that Judge Hines permitted Dr. Steven Hayne to testify during the sentencing phase of the trial, despite the prosecutor's concession that the defense might be correct in its opinion that Dr. Hayne could not be permitted to testify.  Jones argues that the act of the judge having his law clerk research the point demonstrates bias.  This Court finds that Judge Hines's desire to know the law and make the correct decision in no way demonstrates bias against Jones.  Moreover, it does not appear from the record that Dr. Hayne even testified during the sentencing phase of the trial.  Accordingly, this issue is moot.

¶73.   In light of the record as a whole, and after considering each of his allegations of bias, Jones has not proven, to this Court's satisfaction, that a reasonable person, knowing all the facts and circumstances, would harbor doubts about Judge Hines's impartiality.  Consequently, this assignment of error is without merit.

### VI.    WHETHER CUMULATIVE ERRORS IN THIS CASE DENIED JONES HIS RIGHT TO A FAIR TRIAL.

¶74.   In his final assignment of error, Jones alleges the trial court committed numerous other errors, the cumulative effect of which deprived him of a fair trial.  In this assignment of error, Jones offers little or no authority or record support for his arguments.  As stated, this Court is under no obligation to review

assignments of error unsupported by argument or citation to authority." ***Pace v. State***, 419 So. 2d 1324,1325-26 (Miss. 1982). However, due to the seriousness of the crime Jones was convicted of committing and the fact that he will be incarcerated for the remainder of his life, each of his arguments have been considered and will be addressed.

### *(1) Fruits of the Poisonous Tree.*

¶75. First, Jones reiterates his allegation that his confessions and all evidence gained because of them and subsequently used against him should have been suppressed as fruit of the poisonous tree flowing from his illegal arrest, the violation of his right to counsel, and the intervention of the District Attorney. Each of these allegations has already been discussed and dismissed as lacking merit. Therefore, no further discussion is warranted here.

### *(2) Disqualification of District Attorney.*

¶76. Next, Jones argues that the trial court erred by refusing to disqualify District Attorney Frank Carlton as he was a potential witness in the case and by allowing him to participate in the case and remain in the courtroom, though other witnesses were sequestered. Jones cites numerous cases for the proposition that courts and prosecutors should strive to avoid even the appearance of impropriety. However, no such appearance was created in this case. Carlton was not a fact witness. He was a witness to a preliminary matter and testified at the suppression hearing outside the presence of the jury. Once the decision was made by Judge Hines to deny the motion to suppress Jones's statements, there could not have been any further purpose or use in having Carlton as a potential witness.[8] This assignment is without merit.

### *(3) Disqualification of Jurors.*

---

[8]As illustrated by the fact that Jones did not call Carlton to testify during his case in chief.

¶77. Jones further asserts error in the trial court's overruling his motion to disqualify a panel of jurors because, during voir dire as to juror's opinion of the death penalty, one among them made the comment "if you commit a crime and you kill someone, then you should give your own life." The defense moved to disqualify the panel. The court did not grant the motion but rather examined the other members as to whether the comment changed their positions. At the conclusion of the case, Jones was sentenced to life imprisonment. As he did not receive the death penalty, this issue is moot.

### (4) Injury to Jones's hand.

¶78. Jones claims the trial court erred in allowing any evidence regarding his cut hand, arguing it was fruit of an illegal arrest and was a warrantless search of the Defendant's person in violation of the Fourth and Fourteenth Amendments of the U.S. Constitution and Article 3, Section 23 of the Mississippi Constitution. This contention was analyzed and dismissed as having no merit in Section II *supra*.

### (5) Evidentiary Rulings.

¶79. Jones asserts various evidentiary rulings made during the trial as error. These include: allowing the jury to have copies of statements during the trial and thereby putting added emphasis on that evidence; allowing redirect examination over defense objection concerning the lineup; overruling an objection concerning garbage bags; overruling an objection to the cumulative testimony of Peggy Kuntz; overruling an objection to the testimony of Dr. Steven Hayne as being cumulative to that of the coroner; and allowing Pam Miller to testify despite defense objections that her testimony was cumulative of crime lab testimony.

¶80. Questions of relevancy and admissibility are left to the discretion of the trial court. ***Century 21 Deep South Properties, Ltd. v. Corson***, 612 So.2d 359, 369 (Miss.1992). "Admission of testimony is subject only to an abuse of discretion review." ***Tatum v. Barrentine***, 797 So. 2d 223, 230 (Miss.

2001) (citing *Thompson Mach. Commerce Corp. v. Wallace*, 687 So. 2d 149, 152 (Miss. 1997)).

Evidentiary rulings are within the broad discretion of the trial court and will not be reversed absent an abuse of discretion. *Coleman v. State*, 697 So.2d 777, 784 (Miss.1997). In this Court's opinion, the trial court did not abuse his discretion in admitting this evidence.

*(6) Denial of Defendant's Motion to Exclude the State's Evidence.*

¶81.   Jones next argues Judge Hines erred in denying his motion to exclude the State's evidence and direct a verdict for the defense. This issue is without merit. The evidence presented by the State was sufficient for the jury to convict Jones of the crime charged. It cannot be said that it was against the great overwhelming weight of the evidence or manifestly wrong. The State presented evidence that Jones lived with and worked for Wilkerson, that he left town on the day of the murder, that he confessed to committing the murder and that he was hired and paid for the murder by Shamoun. They told the jury how Jones led them to the murder weapon, and how he led them to Wilkerson's car, which was in the bottom of a lake. The jury was justified in returning a verdict of guilty on the evidence. This issue is without merit.

*(7) Denial of motions for mistrial.*

¶82.   Jones alleges the trial court erred in denying two motions for mistrial due to alleged prosecutorial misconduct during his closing argument in the sentencing phase. During his closing argument, the district attorney told the jury, "[y]ou might also say a prayer for the Wilkerson family." The defense objected, and the trial court sustained the objection. Later in the same argument, the district attorney stated, "The Bible tells you that you reap what you sow." The defense objected, and the judge overruled the objection, finding that the district attorney was using the Bible for a literary reference rather than to interject religion.

34

¶83.    A party has broad latitude in closing argument. *Wells v. State*, 698 So.2d 497, 506 (Miss.1997). In determining whether a prosecutor's remarks necessitate reversal, the test is whether the natural and probable effect of the prosecuting attorney's improper argument created unjust prejudice against the accused resulting in a decision influenced by prejudice. *Davis v. State,* 530 So.2d 694, 701 (Miss.1988). The trial judge is in the best position to determine the prejudicial effect of the objectionable comment; thus the trial court is entrusted with the discretion to determine whether an improper statement made during a closing argument warrants a mistrial. *Alexander v. State,* 602 So.2d 1180, 1182 (Miss.1992). In light of the overwhelming evidence against Jones, the jury's verdict likely was not influenced by any prejudice that might have resulted from the district attorney's isolated comments. As the trial judge was in the best position to determine the level of

prejudice, if any, that resulted from this comment, this Court will defer to his finding. Therefore, this issue is without merit.

¶84.    Jones also argues that the court erred in denying a motion for mistrial following a disruption of the trial by the victim's family. Apparently, some of them left the courtroom crying loudly during Dr. Steven Hayne's testimony. The judge sent the jury out of the courtroom and admonished the spectators to remain quiet. The defense did not request and the trial judge did not give a curative instruction to the effect that the jury should disregard the outburst. However, the trial judge did ban all the persons who disrupted the proceeding from attending the remainder of the trial.

¶85.    In *Chase v. State,* 645 So.2d 829, 848-49 (Miss.1994), during the guilt phase of the trial, the victim's widow took the stand and began crying as she described her husband's murder. This prompted

other family members in the audience to begin crying as well. Defense counsel made an objection for mistrial which the trial court overruled. This Court stated that, "the trial judge is in a better position to assess the effect of such an incident than is this Court on appeal, and this Court will not reverse on the failure to grant a mistrial unless a trial judge abused his discretion in overruling the motion for a mistrial." *Id*. at 848 (quoting *Ladner v. State,* 584 So.2d 743, 753 (Miss.1991)). *See also Davis v. State*, 530 So.2d 694, 697 (Miss.1988). In *Floyd v. State,* 166 Miss. 15, 148 So. 226, 232 (1933), this Court held, "as long as an audience does not disturb or prevent a fair trial, we cannot control the lower court in its discretion, and tell it when to exercise authority and when not. It is only when it is evident that such authority should be exercised, and is not, that this Court will interfere."

¶86.    In the case at bar, the trial court immediately restored order to the courtroom and admonished the spectators of the impropriety of their actions and that any further outbursts would result the declaration of a mistrial. He banned the spectators that caused the disruption from attending the remainder of the trial. The trial court immediately admonished the spectators, and no other outburst occurred. This issue is without merit.

> *(8) Failure to Grant Continuances.*

¶87.    Jones argues that he was denied a fair trial by the refusal of a continuance for the purpose of securing an investigator in West Virginia and a mental health professional to evaluate the defendant and to prepare to testify at the sentencing phase. This issue was addressed in Section V (2), *supra*, in regard to Jones's claim of judicial bias. Here, as there, this Court holds that this issue is moot because Jones did not receive the death penalty.

¶88.    Jones reiterates his argument that it was error to deny a continuance for the purpose of allowing the defense to review the DNA evidence and discuss this with the defense experts prior to the

36

commencement of trial. Jones also argues that it was error to force the defense to trial before they had adequate time to prepare to meet the State's DNA evidence which was provided to them one week before trial. This issue has also been raised and dismissed earlier. *See* Section V (3), *supra*. It is also moot because the DNA evidence was ruled inadmissible by the trial court.

¶89.    This issue is without merit.

## CONCLUSION

¶90.    For the reasons set forth herein, Jones's conviction and sentence are affirmed.

¶91.    **CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT, WITHOUT THE POSSIBILITY OF PAROLE, IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.**

**PITTMAN, C.J., McRAE AND SMITH, P. JJ., WALLER, COBB, EASLEY, CARLSON AND GRAVES, JJ., CONCUR.**